IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

GORDON C. JONES; KELLY W. & DENA )
R. CASSIDY; SCRUB JAY LLC; MARK A. )
& CANDICE W. STAYER; DHR, LLC; )
CENTRAL CASCADE VENTURES LLC; )
and CHERRYANDGRAY 1, LLC, )
)
        Plaintiffs, )   TC-MD 110492C
)
   v. )
)
JEFFERSON COUNTY ASSESSOR, )
)
        Defendant. )  **DECISION**

Plaintiffs have appealed to this court seeking a reduction in the value of certain real

property identified in the assessor's records as Account 1313 for the 2010-11 tax year. Trial in

the matter was held by telephone November 10, 2011. Plaintiffs were represented by

Christopher K. Robinson, attorney at law, and Sharon B. Tuppan, attorney at law. Defendant

was represented by Alexa N. Gassner, County Counsel. Testifying for Plaintiffs were Kirk Ward

(Ward), Norris & Stevens, Investment Real Estate Services, and William E. Leavens (Leavens),

Certified General Appraiser in the states of Oregon and Washington.

I. STATEMENT OF FACTS

The subject property is a 64 unit apartment complex on an approximately five acre parcel

in Madras, Oregon, that was built in 1996. (Ptfs' Ex 1 at 2, 16.) There are 36 two-bedroom,

one-bath units that are 724 square feet in size, and 28 three-bedroom, two-bath units that are 924

square feet in size. (*Id.* at 16.) The larger three-bedroom units have washer/dryer hookups. (*Id.*

at 17.) The units are housed in seven two-story buildings made of wood frame construction with

hardi type lap exterior siding and average quality vinyl windows. (*Id.*) Access to the second

story units is by covered exterior stairwells. (*Id.*) There is also an office building and a small

/ / /

single-story laundry building. (*Id.*) The on-site laundry machines are operated by a third party vendor.

By their Complaint, Plaintiffs requested a reduction in the real market value (RMV) to $920,000. (Ptfs' Compl at 1.) Defendant filed an Answer asking the court to "[s]ustain [the] county's real market and assessed value of $2,150,796." (Def's Ans at 1.) Plaintiffs amended their request at trial to conform to the evidence, requesting an RMV of $935,000.

The property was originally on the assessment and tax rolls with an RMV of $2,150,796, a maximum assessed value (MAV) of $2,281,090, and an assessed value (AV) of $2,150,796. (Ptfs' Ltr at 2, May 12, 2011.) Plaintiffs appealed to the County Board of Property Tax Appeals (Board) and the Board reduced the RMV and AV to $1,700,000. (*Id.*) As indicated above, Plaintiffs are seeking a reduction in the RMV to $935,000 and Defendant is requesting an increase in the RMV to $2,150,796.

In support of their value reduction request, Plaintiffs submitted a 100 page appraisal report prepared by Leavens, which values the property at $935,000 under the income capitalization approach and $895,000 under the sales comparison approach. (Ptfs' Ex 1 at 47, 56.) Leavens testified that he gave primary reliance on the income capitalization approach and concluded with a value reconciliation of $935,000. (*Id.* at 47.) That report was admitted into evidence. The court also admitted Plaintiffs' Exhibits 3 and 4, which are operating statements and rent rolls for the subject property for the years 2007 through 2009. Plaintiffs did not offer their Exhibit 2, a five page document described in the cover letter to Plaintiffs' attorney Mr. Robinson as the county's appraisal.

Defendant's appraisal was excluded from evidence because it was not timely exchanged. That report, intended as Defendant's Exhibit A, was postmarked October 31, 2011, and received and filed by the court on November 3, 2011. The court's exhibit exchange rule, TCR-MD 10 C(1), provides in relevant part:

DECISION  TC-MD 110492C                                                                                    2

"Unless otherwise set by the court, all exhibits must be either postmarked at least 14 days before the trial date or physically received at least 10 days before the trial date."

TCR-MD 10 D sets forth the sanctions a magistrate may impose when evidence is received after the exchange deadlines, and provides that "[a] magistrate may exclude any evidence received after the time of exchange."

## II. ANALYSIS

The issue in this case is the RMV of Plaintiffs' property as of January 1, 2010. Oregon law defines RMV for property assessment and taxation purposes as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[1]

While there are three recognized methods for valuing property, the sales comparison approach is most appropriate for valuing residential property, particularly in cases where only the value of the land is at issue.[2] The court looks at arm's-length sales transactions of similar property to determine a correct RMV. *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003).

Plaintiffs' case was presented through the testimony of two highly qualified real estate professionals: Kirk Ward (Ward), with Norris & Stevens, who specializes in apartment brokerage and has 35 years of experience, and William Leavens (Leavens), an appraiser certified in the states of Oregon and Washington who has 10 years of appraisal experience.

/ / /

---

[1] All references to the Oregon Revised Statutes (ORS) are to the 2009 edition.

[2] An administrative rule promulgated by the Oregon Department of Revenue instructs that the three approaches to value--sales comparison, cost, and income--be considered in determining a property's value, but recognizes that all three approaches may not be applicable in a given case. OAR 150-308.205-(A)(2) (2009). Because the subject property is owner occupied and does not generate any income, neither party used the income approach in valuing Plaintiff's property. Because land value is at issue, the typical methodology prescribed by the cost approach is not relevant.

Ward testified at length about principles of market areas in terms of property valuation and stated that of the 37 cities in Oregon in which the management company for which he works (Norris & Stevens) operates, Madras was, in his professional opinion, the weakest market area. Ward testified about vacancy rates, explaining that there is both a "physical vacancy," which is the actual absence of a tenant, and "economic vacancy," which is comprised of landlord concessions such as one month of free rent upon signing a 12 month lease and the nonpayment of rent, which often leads to eviction after one or more months of no rent payments. As a result, economic vacancy is often, as in this case, higher than physical vacancy. However, Ward testified that the subject property had 100 percent turnover in 2009, explaining that all 64 units were at one time vacant that year. According to Ward's testimony, the subject property had an average physical vacancy rate of fourteen percent per month and an additional economic vacancy rate of 10 percent for a combined total of approximately 25 percent.

Ward testified that the owners of the subject property have a "sister property," which is essentially identical to the subject property but is located in Hermiston, Oregon. That property, however, greatly outperformed the subject property. In 2009, the Hermiston property generated $100,000 more revenue than the subject and had $62,700 less in operating costs (as a percentage of effective gross income and cost per unit). According to Ward, the biggest reasons for the difference in expenses between the two properties are the much higher utility costs in Madras and greater advertising costs. Additionally, the Madras property experienced significantly more tenant turnover (100 percent for the subject versus 50 percent for the Hermiston property).

Ward also testified about the focus of prospective investors and lenders, the two key players in buying and selling multi tenant real estate. According to Ward, both look almost exclusively at actual net operating income (NOI) rather than prospective (pro forma) revenues. Ward testified that lenders are also interested in current operating expenses.

/ / /

Ward was directed to Leavens's appraisal and pointed out that the subject's NOI declined sharply from calendar year 2008 to 2009, from approximately $106,000 in 2008 to $43,000 in 2009. (Ptfs' Ex 1 at 91, 87.) Defendant's representative, Gassner, attempted to discredit Ward on cross-examination by pointing out that the property's current vacancy rate was only approximately four percent. Ward responded that that rate was for a single month and represented physical vacancy only. The court is not persuaded by Gassner's revelations both for the reasons stated by Ward and because the assessment date is January 1, 2010, and the trial was held in November 2011, nearly two years after the applicable value date. There were additional questions about the $20,000 in advertising expenses for the subject in 2009 and the number of tenants evicted that year, questions aimed at revealing that 2009 was an atypical year. While there certainly is some truth to that, Defendant has no appraisal evidence and Plaintiffs' two experts concluded that the value of the subject was under $1 million, well below the $1.7 million RMV set by the Board.

Leavens testified briefly as to the key aspects of his appraisal report, explaining that he considered but rejected the cost approach to value because of the age of the subject (more than 10 years old) and the fact that there were an insufficient number of vacant land sales. Leavens utilized both the income capitalization approach and the sales comparison approach, and he concluded that the former (income capitalization) was the more appropriate and most reliable indicator of value because the subject is an income-producing property.

Looking at the income capitalization approach, Leavens analyzed actual rents for the subject and rents (unadjusted and adjusted) for five comparable properties in Madras to establish an average adjusted gross rent for the subject. Based on his analysis and appraisal experience, Leavens concluded that the two-bedroom units had an average adjusted rent of $407 per month and that the three-bedroom units had an average adjusted rent of $490 per month for a total annual potential gross income (PGI) of $341,760. (Ptfs' Ex 1 at 36, 43.) Leavens added $8,500

of additional supplemental income for a combined total PGI of $350,260. (*Id.* at 44.) Applying a 15 percent vacancy and credit loss, as explained on page 44 of his appraisal and elaborated on at trial, Leavens arrived at an effective gross income (EGI) of $297,721. (*Id.*)

Leavens next looked at actual operating expenses for the subject property for 2007, 2008, and 2009, which were $166,894, $165,013, and $213,329, and forecasted an appropriate stabilized operating expense figure of $191,858 (annual). (*Id.* at 45.) Subtracting the $191,858 of operating expenses from the PGI of $297,721 resulted in an NOI of $105,863. (*Id.*)

In arriving at an appropriate capitalization rate, Leavens considered five comparable properties, two in Albany, one in Medford, one in Jacksonville, and one in Springfield. Leavens found comparables #2 and #3 to be the most appropriate indicators of a rate for the subject and concluded that the base capitalization rate was 9.35 percent. (*Id.* at 46, 47.) Leavens testified that the tax rate had to be added to the base rate to arrive at an appropriate loaded capitalization rate and that he had made an error in his calculations, which is reflected in his appraisal report at page 47. Whereas he reported the levy rate of 2.12 percent, Leavens testified at trial that the rate should be 1.98 percent for a loaded capitalization rate of 11.33 percent. Applying that rate to the $105,863 NOI results in an indicated value of $935,000.[3]

Leavens analyzed five comparable sales and concluded with an indicated value of $895,000. (*Id.* at 56.) As explained earlier, Leavens placed primary reliance on his income capitalization approach and concluded that an indicated value for the subject property as of January 1, 2010, was $935,000.

Defendant's appraisal was not timely submitted and was therefore excluded by the court. Defendant did not put on a case in chief and the court's determination of value comes down to an evaluation of Plaintiffs' evidence.

/ / /

---

[3] $105,863 ÷ 0.1133 = $934,360, or $935,000 (rounded).

In the final analysis, the value of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted). By statute, Plaintiff has the burden of proof and must establish an error in the record assessment by a "preponderance" of the evidence. ORS 305.427. This court has previously ruled that a "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971); *see also Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 394, 737 P.2d 595 (1987) (where the Oregon Supreme Court explained that the derivation of the word "preponderance" is Latin in origin and "translates to 'outweigh, be of greater weight.' "). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

### III. CONCLUSION

The only evidence before the court is Plaintiffs' appraisal. Plaintiff presented the testimony of two competent experts in the field of property valuation, witnesses whose testimony buttressed the appraisal report Plaintiffs submitted. Based on that report, the court concludes that the real market value of the subject property on January 1, 2010, (2010-11 tax year) was $935,000. Because that number is lower than the current maximum assessed value of $2,281,090, the court concludes that the assessed value of the subject property is, by virtue of law, $935,000. *See generally* ORS 308.146(2). Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that the real market value and assessed value of the subject property, assessor's Account 1313, was $935,000 as of January 1, 2010.

Dated this ___ day of December 2011.

 

 

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on December 16, 2011. The Court filed and entered this document on December 16, 2011.*