IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

GLORIETTA BAY LLC,                      )
                                        )
            Plaintiff,                  )       TC-MD 140072C
                                        )
      v.                                )
                                        )
LINCOLN COUNTY ASSESSOR,                )
                                        )
            Defendant.                  )       **FINAL DECISION**

This Final Decision incorporates without change the court's Decision entered

December 30, 2014. The court did not receive a request for an award of costs and disbursements

within 14 days after its Decision was entered. *See* TCR-MD 16.

Plaintiff appeals the real market value of property identified as Account R509910

(subject property) for the 2013-14 tax year. A trial was held in the Oregon Tax Courtroom on

August 27, 2014, in Salem, Oregon. Scott Lepman (Lepman), Oregon Certified General

Appraiser and managing member of the LLC, appeared and testified on behalf of Plaintiff.

Kathy Leib (Leib), Oregon Registered Appraiser 3, Lincoln County Assessor's office, appeared

and testified on behalf of Defendant. Terry Shawn Wylie, Chief Appraiser, Lincoln County

Assessor's office, also testified briefly for Defendant on cross-examination by Plaintiff.

Plaintiff's Exhibits 1 through 10 were received without objection. Plaintiff's Exhibit 11, a fee

appraisal made for Plaintiff by Herald S. Haskell (Haskell), MAI, SRA, dated June 18, 2014, but

which estimates the value of the subject property as of the January 1, 2013, assessment date, was

/ / /

/ / /

/ / /

admitted over Defendant's objection.[1]  Defendant's Exhibits A through H were received without objection.

## I.  STATEMENT OF FACTS

A.  *Overview of the Subject Property - Description*

The subject property is a self-storage ("ministorage") facility in Waldport, Oregon, with four separate storage buildings that were erected on the property in 2005.  (Ptf's Exs 11 at 9, 2 at 3, 3 at 1-2; Def's Ex A at 2.)  The four buildings have a total of 16,500 square feet of enclosed storage space.  (Ptf's Ex 11 at 2; Def's Ex C at 2.)  The subject property also has a 1,040-square-foot manager's apartment/office providing on-site presence at all times. (Ptf's Ex 11 at 2; Def's Ex A at 2.)  The facility has 4.3 acres of land that is zoned IP (Planned Industrial).  (Def's Exs D at 1, H at 30.)  The parties agree that the buildings have wood frame exterior walls with wood siding, wood framed ceilings with plywood sheathing and seam metal roof, built on reinforced concrete slabs.  (S*ee* Def's Ex H at 31.)

The parties testified, and the exhibits confirm, that there are a total of 100 individual, enclosed, lighted and heated storage units with roll-up doors, and a graveled yard (aisles, driveways and parking areas) on the developed portion of the subject property, which includes an area for outdoor, uncovered parking of vehicles that Lepman described during trial as "RV

/ / /

---

[1] Defendant's objection was based on the absence at trial of the author of Plaintiff's appraisal, which denied Leib an opportunity to cross-examine the appraiser.  ORS 305.501(4)(a) (2013) provides, in relevant part, that "a magistrate is not bound by common law or statutory rules of evidence or by technical or formal rules of procedure, and may conduct the [trial] in any manner that will achieve substantial justice."  Magistrates are "[s]ubject to the rules of practice and procedure established by the tax court." (*Id*.)  With those statutory provisos in mind, and in the absence of a Tax Court rule specifically precluding the admission of a document such as an appraisal report where the author is unavailable to authenticate the report and undergo cross-examination, the court gave Leib an opportunity to express her questions and concerns about the appraisal report.  Leib's objections were considered by the court when it determined the proper weight to give that appraisal report.

storage." (*See also* Ptf's Ex 2 at 1-2; Def's Exs A at 2, H at 31.) There are approximately 25 outdoor, uncovered parking spaces.[2] (Def's Ex A at 2; Ptf's Ex 11 at 22, 24.)

The subject property has perimeter chain-link fencing with a key pad entry, exterior yard lighting, and various other on-site improvements. (Def's Exs A at 2, H at 31.) The facility encompasses three separate, contiguous land parcels which are identified in Defendant's records as separate tax "lots," but carried in the assessor's records as one 4.3 acre tax *account* (with a single tax statement). (Ptf's Ex 11 at 2; Def's Ex A at 3.) According to the parties' appraisal reports and trial testimony, between 1.8 and 2.2 acres of that land is currently developed.[3] (*Id.*) The parties agree that a portion of the undeveloped land, approximately 0.86 acres, is "identified" as wetlands, and that the remaining land (between 1.26 and 1.64 acres) is not currently developed. (Ptf's Ex 7 at 2; Def's Ex A at 3.) The four storage buildings range in size from 40 feet by 120 feet to 30 feet by 110 feet. (Def's Exs A at 2, C at 1.)

Lepman testified about the wetlands problem impacting the subject property. Plaintiff submitted a "Wetland Delineation / Determination Report" to the Department of State Lands after its July 2013 purchase. (Ptf's Ex 7.) The size of the wetlands area is reported to be 0.86 acres. (*Id.* at 2.) Lepman testified that the wetlands were not in a single area to the west side of

---

[2] The outdoor, uncovered parking spaces are on the perimeter of two sides of the subject property. (Def's Ex A at 4.) The area has a graveled surface and the spaces are not delineated by painted striping, so it is difficult to specify precisely how many spaces there are. (Def's Ex A at 4, 6, 7; Ptf's Ex 2 at 1.) The parties both submitted exhibits stating there are 25 such parking spaces, but there was testimony from Lepman that there may actually be as few as 18 of the outdoor, uncovered parking spaces due to seasonal wetlands and other factors.

[3] Plaintiff's appraisal notes the property is 4.3 acres, has 0.84 acres of wetlands, and 1.26 acres of "surplus land," leaving 2.2 acres as developed. (Ptf's Ex 11 at 2). Plaintiff's Wetland Delineation / Determination Report, prepared for Plaintiff by Geo Resources for submission to the Department of State Lands, indicates there are 0.86 acres of wetlands, which reduces slightly the developed area to 2.18 acres. (Ptf's Ex 7 at 2.) Defendant agrees with the 0.86 acre wetland figure. Leib's written narrative describing the subject property notes there are 0.86 acres of wetlands, and states that "[a]pproximately 1.8 acres have been developed at this time." (Def's Exs A at 3, D at 2.) Defendant's numbers translate to 1.64 acres undeveloped; Plaintiff's numbers equate to 1.26 acres of available, undeveloped land (4.3 total acres, less 0.86 acres wetlands, less 2.18 acres developed). Plaintiff believes the area affected by the wetlands exceeds 0.86 acres, which, if true, further reduces the size of the "surplus," or available but undeveloped land.

the subject property, but rather, are in numerous areas on the west side of the subject property. Lepman further testified that it was his opinion, based on his familiarity with the subject property, having owned it through both the dry and wet seasons of the year, that the whole western portion of the subject property is impacted by the wetlands, and that the impacted area is greatly in excess of 0.86 acres. It is Lepman's belief that the entire west side of the subject property is not capable of any future development for either buildings or uncovered outdoor parking. Lepman testified that part of the problem is that any future development of the west side of the subject property would have to be done in a manner that did not disturb the wetlands area and that governmental requirement increases the size of the wetlands area. That is an issue because Defendant believes that the subject property is capable of added development, which would increase the subject property's income-generating potential.

Lepman testified that the buildings on the subject property were built improperly. Plaintiff submitted three photographs that depict the defects in the construction of the buildings causing rainwater to enter the buildings underneath each of the unit's roll-up doors, primarily during the winter months when there are heavy rains and higher wind gusts. (Ptf's Ex 9.) Lepman testified that the doors do not "seat" properly on the outer, lower portion of the concrete slab the buildings are erected upon, but rather, rest directly on the concrete slab (*i.e.*, the storage unit floors) of all the storage units themselves.[4] Lepman opined that the subject property's low occupancy rate was due, at least in part, to the water intrusion problems. Leib noted in her appraisal that there was a problem with wood rot in the manager's office/apartment but "no signs of major rust issues, or wood rot" with the "buildings." (Def's Ex A at 3.)

---

[4] As the court understands the testimony and related photographs, the concrete slab under each building was improperly built; the flat concrete slab "lip" is not deep enough for the overhead doors to seat below the slab height (*i.e.*, below the interior floor of each storage unit). (Ptf's Ex 9 at 1-2.)

B.    *The Subject Property's Location*

Waldport is a small town on the Oregon Coast located south of Newport, Oregon, which is one of Oregon's larger coastal towns. (Ptf's Ex 11 at 8.[5]) A listing for the subject property, submitted by Plaintiff, states that Waldport is on "Alsea Bay, 15 miles south of Newport and 8 miles north of Yachats, * * * [with] a population of 4,010 * * *." (Ptf's Ex 3 at 2.) The town of Waldport is bordered by the Pacific Ocean on its west, with Highway 101 running through the center of the town. (*See* Ptf's Ex 11 at 8.) A map of the area included in Plaintiff's appraiser Haskell's report, and Lepman's testimony, both reveal that the subject property is located away from the downtown area in a somewhat remote location well off Highway 101 in a relatively rural, undeveloped area. (*Id.*) The subject property is located "on the southwest corner of Crestline Drive and SW Kathleen Street." (*Id.* at 9.) The subject property's entrance is on SW Kathleen Street, not the busier Crestline Drive. (Ptf's Ex 7 at 15; Def's Ex A at 4.)

Leib's written description of the subject property and her trial testimony offer a slightly different viewpoint as to the subject property's location. (Def's Ex A at 2.) Leib testified that, although the subject property is located on the "outskirts" of town, it is in close proximity to several establishments that she views as beneficial to the subject property. Leib testified that the town's waste disposal transfer station is nearby ("very close" to) the transfer station, the "satellite location" of the Oregon Coast Community College is nearby, and the new Waldport high school and middle school are in the "same general area." Leib also testified that there was another ministorage facility "nearby." Leib's report indicated that the subject property is "next to a main road in the housing area around Waldport High School and Elementary School," that a golf course is located nearby, and that there is an area of "concentrated housing between

---

[5] Plaintiff's Exhibit 11, page 8, is a map of the town of Waldport.

Highway 101 and Crestline Drive[,] [b]oth [of which] are major arteries in the area." (*Id.*) Leib testified that she considers the subject property to be "in a good place."

Lepman, who owns eight other ministorage facilities in Oregon, disagreed with Leib's conclusion. Lepman testified that the facility is not on a busy road; he was adamant on that point.

C.      *Subject Property's Development and Sales History*

The subject property was purchased as an undeveloped bare land site in 2005 for $169,000. (Def's Ex A at 2.) That purchaser, J & J Storage LLC (J & J Storage), constructed the existing buildings between 2005 and 2006 and operated the storage facility before an eventual foreclosure by the lender on September 26, 2011. (Def's Ex A at 2; Ptf's Ex 11 at 2.) The lender "bought" the subject property at a public auction, following foreclosure against J & J Storage and seizure by the Lincoln County Sheriff, for $711,842. (Ptf's Ex 1 at 1; Def's Ex A at 2.) According to the evidence, the lender managed and maintained the subject property for approximately two years, eventually selling the subject property to Plaintiff on or about July 31, 2013, for $410,000. (Ptf's Exs 6 at 1, 11 at 15; Def's Ex A at 2-3.) The reported list price at the time of Plaintiff's purchase was $630,000. (Ptf's Exs 3 at 1, 11 at 2.) Lepman testified that Plaintiff acquired the subject property after its initial offer of $380,000 was rejected by the lender/owner. (*See also* Ptf's Ex 11 at 2.) Lepman testified that while the bank held title to the subject property, it hired an independent company to operate, maintain, repair, and market the facility during the nearly two-year period that the bank owned the subject property. Lepman submitted an exhibit showing that the facility was professionally marketed by Colm Commercial (Colm) for $632,000. (Ptf's Ex 3 at 1-3.)

/ / /

D.    *The Subject Property's Tax Roll Value and the Parties' Requested Values*

Defendant's real market value on the assessment and tax rolls for the 2013-14 tax year was $699,890, with $200,240 allocated to the land and $499,650 to the structures. (Ptf's Compl at 2.) Plaintiff appealed the real market value to the Lincoln County Board of Property Tax Appeals (Board) and the Board reduced the real market value to $533,000, reducing the land to $161,070 and the structures to $371,930. (*Id.*)

Plaintiff seeks a reduction in the real market value to its July 2013 purchase price of $410,000. (Ptf's Compl at 1.) In its Answer, Defendant requested that the court sustain the Board's value of $533,000. (Def's Ans at 1.) Defendant increased its real market value request to $627,660 at trial, relying on its value estimate under the sales comparison approach. (Def's Ex E at 6.)

E.    *Plaintiff's Value Evidence*

1.    *Plaintiff's Evidence of Actual Income and Expenses*

Plaintiff's evidence included actual income and expense information for the subject property for calendar year 2012, which is the year before Plaintiff purchased the ministorage facility. (Ptf's Ex 4.) Lepman testified that Plaintiff relied on that information in purchasing the subject property, but that he also did his own income estimate (see below). Actual net operating income for the subject property in 2012 was $17,177. (*Id.* at 2.) That net operating income was based on total gross income of $64,404 (rounded) and actual expenses of $47,227 (rounded). (*Id.*) Lepman acknowledged that the expense ratio of 73.33 percent was high, but testified that the reason for that high ratio was the subject property's low occupancy in 2012. Of the 100 indoor storage units, occupancy in 2012 ranged from a low of 47 units in January 2012 (a vacancy rate of 53 percent) to a high of 70 units in August 2012 (a vacancy rate of 30 percent).

(*Id*. at 16.)  Overall occupancy for both indoor units and outdoor parking spaces ranged from a low of 43.9 percent in January 2012 to a high of 65.9 percent in August 2012.  (*Id*.)

2.       *Plaintiff's Pro Forma Income Analysis*

Lepman testified that he performed his own pro forma estimate of the subject property's income based on actual income and expense data and rental rates for the various units and concluded that potential gross income for the subject property at 100 percent occupancy was $10,240 per month, or $122,880 per year.  Lepman testified that a comparison of potential gross income at full occupancy to total actual gross income for 2012 of $64,404 resulted in a "52 percent financial occupancy" rate.[6]

3.       *Plaintiff's Written Purchase Proposal for the Subject Property*

Plaintiff also submitted into evidence a written purchase proposal dated October 7, 2012. (Ptf's Ex 5.)  That document, prepared by Lepman, evaluated the subject property under the income approach.  (*Id*.)  Lepman's valuation of the subject property at that time was $347,000. (*Id*. at 6.)  That figure is based on a stabilized gross income of $78,000, expenses of $60,000, for a net operating income of $18,000, which Lepman capitalized at seven percent, although his report indicates that he felt an appropriate capitalization rate for the subject property, which he viewed as "non-performing, non-stabilized," would be 8.5 percent.  (*Id*. at 4-6.)  Capitalizing the $18,000 net operating income at seven percent generated a value of $260,000 (rounded). (*Id*. at 5.)  Lepman added $120,000 for surplus land (at $1 per square foot), for a total value for the subject property of $380,000.  (*Id*.)  Lepman then subtracted $33,000 for needed repairs to arrive at his final value conclusion of $347,000.  (*Id*. at 5-6.)  The repairs noted in the report included $13,000 to cure a water penetration issue stemming from rainwater entering the storage

_____

[6] Lepman arrived at his 52 percent figure by dividing actual 2012 gross income of $64,404 by total potential gross income of $122,880.

units under improperly installed doors ($130 per unit),[7] and $18,000 to repair problems with incorrect installation of the siding. (*Id.*) Lepman testified that rainwater enters the buildings through the gable ends because of the incorrect installation of the siding.[8] (*Id.*) Lepman testified that he spoke with the property managers overseeing the subject property in October 2012 and was advised that the ongoing problem with water penetration allowed mold to grow inside at least some of the units. Lepman's proposed solution was to replace the damaged sheet rock, which he estimated would cost $2,000.[9] (*Id.* at 6.)

Based on Lepman's analysis, set forth immediately above, Plaintiff offered to purchase the subject property "as is" for $380,000. (*Id.*) Lepman testified that Plaintiff's $380,000 purchase offer included lender financing plus his personal guarantee on the loan backed by his ownership of other ministorage facilities. The written purchase proposal letter confirms Lepman's personal guarantee. (*Id.* at 7.)

Lepman testified that the owner of the subject property at that time - the bank/prior lender - failed to respond to Plaintiff's $380,000 offer made in October 2012. Lepman further testified that approximately six months later the realtor marketing the subject property telephoned him

---

[7] Lepman testified on cross-examination that his solution to fixing the problem with the water leaking under the storage unit doors was to grind down the concrete at each door to allow the doors to drop below the level of the concrete slab that forms the floor of each storage unit. Lepman further testified that the grinding process would likely require having the storage unit occupants move their belongings temporarily while the repairs were being made. Lepman testified that he felt the actual cost of the repair (grinding the concrete) would likely be $350 per unit, or $35,000. That figure is $22,000 greater than the asmount he deducted from his value estimate when submitting his purchase proposal to the lender/owner prior to his acquisition. The $35,000 repair figure also appears in Plaintiff's appraiser's "Limited Appraisal Report." (Ptf's Ex 11 at 21). Adding $22,000 to Plaintiff's original $380,000 purchase offer is still $8,000 less than what Plaintiff eventually paid for the property.

[8] Plaintiff's written purchase proposal to the owner of the property in October 2012 stated in relevant part: "[t]he buildings were built incorrectly. I have interviewed the current managers who state that during the rainy season, wind driven rain blows into the gable ends of the buildings which cause damage to the tenants' goods. The current solution is to not rent the units or provide wood pallets to the tenants to keep their goods from getting water damaged. This is not a permanent solution and allows moisture into the building. * * * I estimate the cost to fix the eight ends of each building at $18,000." (Ptf's Ex 5 at 5-6.)

[9] Plaintiff's October 2012 written purchase proposal states in part: "I have interviewed the current managers who state that the water intrusion has allowed conditions for mold to grow." (Ptf's Ex 5 at 6.)

and reported that some repairs had been made in an effort to cure the leaky siding. Lepman testified that, based on that information, Plaintiff increased its purchase offer to $410,000 in May of 2013. The closing statement for the purchase of the subject property confirms Plaintiff's purchase for $410,000 on July 31, 2013. (Ptf's Ex 6 at 1.)

4.    *Bank's Listing*

At some point prior to Plaintiff's $410,000 purchase, Colm, a real estate management and sales company, listed the subject property for $632,000. (Ptf's Ex 3 at 1.) That listing was based on potential gross income of $122,880, a vacancy rate of five percent, total operating expenses of $41,355, capitalized at eight percent, for a value estimate of $513,562, plus $118,458 for "excess land." (Ptf's Ex 3 at 3.) That brought the total listing price to $632,000. (*Id.*) That report stated that there is a "neighboring mini storage [facility that] is 95% occupied." (Ptf's Ex 3 at 2.)

5.    *Occupancy Rates*

Plaintiff submitted a table depicting the physical occupancy rates for the subject property from July 2013 through August 2014. (Ptf's Ex 10 at 2.) The occupancy rates ranged from a low of 58 units in January and February 2014 to a high of 73 units in July 2013. (*Id.*) In that 14-month period, the rate of occupancy only exceeded 70 out of the 100 units in four of the 14 months. (*Id.*) The occupancy rate for 2012, the calendar year immediately prior to the January 1, 2013 assessment date, was between 47 percent and 70 percent. (Ptf's Ex 4 at 16.)

6.    *Plaintiff's Written Appraisal Report*

The court also admitted, over Defendant's objection, an appraisal offered by Plaintiff that was prepared by Haskell that valued the subject property at $425,000 as of January 1, 2013. (Ptf's Ex 11.) Haskell's report stated he is "familiar with the history of the property, as [he]

originally appraised the property for the construction lender." (*Id.*) Haskell further reported that "[a]fter construction was completed, [he] appraised the property in 2007, 2009 and 2010." (*Id.*) That appraisal provided a value estimate of $425,000 for the subject property as of January 1, 2013, which is the assessment date for the 2013-14 tax year. (*Id.* at 2-3.)

Haskell considered all three approaches to value, but excluded the cost approach as inapplicable because of the "age and condition of the building improvements; making it difficult to accurately measure accrued depreciation." (*Id.* at 19, 27.)

a.      Sales Comparison Approach

Haskell's valuation under the sales comparison approach is $422,700 based on six comparable sales occurring between September 2011 and September 2013 for prices ranging from a low of $465,000 to a high of $1,740,000. (*Id.* at 19, 21.) Haskell's comparables varied in size from a low of 13,800 square feet to a high of 49,970 square feet. (*Id.* at 20) Haskell determined a value range, after adjustments, of $12.87 to $30.80 per square foot. (*Id.*) Haskell relied on an "overall weighted average" of $22.75 per square foot." (*Id.*) Multiplying that per-square-foot value by a building area of 16,500 square feet for the ministorage facilities, and the 1,040-square-foot manager's apartment/office, resulted in an indicated value estimate of $375,375. (*Id.* at 2, 21.)[10] Haskell then deducted $35,000 for the estimated cost of the deferred maintenance that required immediate repair, and added $82,278 for 1.26 acres of wetlands affected area that he described as "surplus land." (*Id.* at 21.) Those numbers resulted in an indicated estimated value of $422,700 under the sales comparison approach. (*Id.*)

/ / /

---

[10] The initial page of the appraiser's report provided information on the square footage of the structures on the property, and page 16 of Haskell's appraisal stated that he multiplied the "building area" by the per-square-foot value. (*See also* Ptf's Ex 11 at 21)

b.    Income Approach

Haskell's value estimate under the income capitalization approach was $437,100 based on a potential gross income of $119,400,[11] a stabilized vacancy loss rate of 20 percent, for an effective gross income of $95,520, less total expenses of $49,653 (rounded), for a net operating income of $45,867. (Ptf's Ex 11 at 22-23, 26.) Haskell's 20 percent stabilized vacancy rate was based on data from other facilities, and taking into account the "location, age, quality and limited amenities associated with subject property." (*Id*. at 22.)

Haskell capitalized the $45,867 net operating income at 10 percent, although he notes in his report that the average capitalization ate based on the data he looked that was 8.48 percent. (*Id*. at 23-24.) Haskell explained that he selected a 10 percent capitalization rate "[i]n view of the location, size, age, quality and condition of the subject property." (*Id*. at 24.)

Applying that 10 percent capitalization rate to a net operating income of $45,867 resulted in a value estimate of $458,672, to which Haskell added $82,300 (rounded) for surplus land, for a total indicated, stabilized value of $541,000. (*Id*. at 24.) Haskell adjusted that $541,000 value estimate for the present value of the estimated rent loss of $103,931 over a projected four-year absorption period he believed was necessary to achieve stabilized occupancy, plus "additional expense * * * associated with holding/marketing/management costs, as well as necessary repairs to achieve stabilized occupancy." (*Id*. at 25; *see also id*. at 26.) Haskell ultimately concluded an "as is" value for the subject property as of the January 1, 2013, assessment date, was $437,100. (*Id*. at 26.)

///

---

[11] Haskell's potential gross income is derived from a gross income of $.55 per square foot per month for the 16,500 square feet of enclosed storage space (which comes to $108,900), plus $35 per space per month for the 25 potential open recreational vehicle (RV) and boat storage spaces. (Ptf's Ex 11 at 22.)

Haskell gave most weight to the sales comparison approach, and ultimately concluded that "the final market value opinion for the subject real estate, in Fee Simple, as of the appraisal date, January 1, 2013, was [] $425,000[.]" (*Id*. at 27.)

F.    *Defendant's Valuation*

Defendant valued the subject property using all three standard approaches to value: cost, sales comparison, and income capitalization. (Def's Ex G at 1.) Defendant determined a value of $701,582 under the cost approach, a value of $627,660 under the sales comparison approach, and a value of $771,810 under the income capitalization approach. (*Id*.)

1.    *Defendant's Cost Approach*

a.    Structures

Using the Marshall & Swift Valuation Service cost calculator, Leib multiplied 16,500 square feet of buildings and structures at $32.61 per square foot, including the forced air propane heating system,[12] adjusted upward by a four percent local cost modifier (1.04) and reduced by 10 percent for quality, 10 percent for depreciation, and 10 percent for economic obsolescence. (Def's Ex C at 2.) Leib's explanation of her obsolescence adjustment at trial conflicts with her written report; Leib's report stated obsolescence is due to the "location of the property," but at trial, Leib testified that the obsolescence adjustment was for the size of the units. (Def's Ex C at 1.) Leib made another 10 percent downward adjustment for "percent good." (Def's Ex C at 2.) Leib's total depreciated replacement cost for the structures (buildings) is $367,145. (*Id*.) Leib added $6,720 for the chain-link fence surrounding the subject property, for a total structures value of $373,865. (Def's Ex C at 3-4.) Leib rounded that figure to $373,860. (*Id*. at 4.)

///

_____
[12] Leib began with a base cost factor of $29.67 per square foot, and added $2.94 for "heating," to arrive at her $32.61 figure.

b.      Land

Leib valued the land component of Plaintiff's subject property for her cost approach using comparable sales.  Leib searched Defendant's sales records for bare land industrial sales but found none in the subject property's neighborhood that had changed hands "in the last five years."  (Def's Ex D at 1.)  Leib did "find three industrial bare land sales in other parts of Lincoln County."  (*Id*.)  Leib's comparable land sales are "located out of the Waldport area," in Depoe Bay (comparable 1), North Newport (comparable 2), and Toledo, Oregon (comparable 3).  (Def's Ex D at 1-2.)  All three properties are smaller than the subject; comparable 1 is 0.15 acres, comparable 2 is 1.01 acres, and comparable 3 is 1.72 acres.  (Def's Ex D at 1-2.)  The sales occurred in June 2012, July 2013, and May 2014.  (*Id*.)  On a per-square-foot basis, those three comparables sold for $9.18 per square foot, $1.70 per square foot, and $2.67 per square foot, respectively.  (*Id*. at 3.)

Two of Leib's three bare land sales were not arm's-length transactions.  Leib noted in her report that comparable 1 "was not advertised, but was located near property that [the buyer] already own[ed]."  (Def's Ex D at 1.)  Leib's report indicated that Defendant's "Data Analyst * * * listed this property as 'not open market[.]' "  (*Id*.)  Leib testified that she did not use comparable 1 because of the conditions of sale, and her report indicated that her "value indicator for bare land sales [was] an average of sales 2 and 3."  (Def's Ex D at 3.)  Leib's bare land sale comparable 3 was also a non-open market transaction; Leib noted in her report that "[t]he new owner * * * responded to [Defendant's] sales questionnaire [] [and] indicated that the land was not advertised, but that they had been looking for property for the previous one to three months. The sale was a cash transaction, and was purchased primarily for its location."  (Def's Ex D at 2.)  As noted above, Leib did use her comparable 3 in arriving at a bare land value estimate.

Leib determined a value per square foot of $2.19 for the bare land. (*Id*.) Leib reduced the effective size of the subject property by 0.86 acres to account for the wetlands, leaving 3.44 acres (149,846 square feet) of land at an indicated value of $327,722. (*Id*.)

Leib added a structures value of $373,860 to the bare land value of $327,722, and came up with a value estimate under the cost approach of $701,582. (*Id*.) There is no indication that, in valuing the subject property's land, Defendant added any value to her bare land sales for site improvements such as water, sewer, electricity, or site development costs, including grading and rocking the parking lot, etc.

2.      *Defendant's Sales Comparison Approach*

Leib also presented a value estimate for the subject property using the sales comparison approach. (Def's Ex E.) Leib's appraisal report stated that:

> "[t]he Lincoln County Assessor's real estate sales records were researched for all sales of property that had mini storage businesses included in the sale. Six sales were found from 2011 through 2014 that included mini storage businesses. Two sales were sales after foreclosure, one was a duress sale, one was a sale to an adjacent land owner, and two were confirmed open market sales. All of the properties were visited."

(Def's Ex E at 1.)

Leib used all six sales in her sales comparison approach. Those sales occurred between April 2011 and April 2014. (Def's Ex E at 1-5.) Two of the six sales occurred in April 2011, and the other four all sold after the applicable January 1, 2013, assessment date. (Def's Ex E at 1-5.) The sale dates for those four post-assessment sales were September 12, 2013, (comparable 3), March 28, 2014, (comparable 4), April 1, 2014, (comparable 5), and April 14, 2014, (comparable 6). (Def's Ex E at 2-5.) Leib's six comparables are located in Siletz, Lincoln City, South Beach, Lincoln City, Depoe Bay, and North Newport, respectively. (Def's Ex E at 1-5.) The actual sale prices for Leib's six comparable sales were $707,500, $1,150,000,

$465,000, $124,000, $425,000, and $2,548,000.  (Def's Ex E at 6.)  The total square footage of the buildings for the six comparable sales are 19,540 square feet, 27,450 square feet, 18,300 square feet, 2,910 square feet, 9,140 square feet, and 52,179 square feet.  (*Id*.)  Leib's comparable sales were built in 2002 through 2008 (comparable 1), 1997 (comparable 2), 1992 (comparable 3), 1975 (comparable 4), 1990 through 1993 (comparable 5), and 2005 (comparable 6).  (*Id*.)  Leib determined per-square-foot values for her comparables by dividing the sale price of the six properties by the total square footage of the buildings.  (*Id.*)  Leib's per-square-foot values were $36.21, $39.41, $24.54, $42.61, $37.22, and $45.89, respectively, for comparables 1 through 6.  (*Id*.)  Leib averaged those numbers and came up with an average sale price per square foot of $38.04.  (*Id*.)  Leib applied that figure ($38.04) to square footage of the subject property (16,500 square feet) and concluded that the "sale value indicated for the subject property is *$627,660*, which is the average price per square foot of storage building."   (Def's Ex E at 5 (emphasis in original).)

### 3.  *Defendant's Income Approach*

#### a.  Using the Subject Property's Reported Income

Leib first evaluated the *actual reported income* and expense information for the subject property, finding a potential gross income of $118,740 at 100 percent occupancy using the subject property's number of units and reported rental rates.  (Def's Updated Ex F at 3.[13])  Leib used the data from the subject property to establish the vacancy rate of 41.6 percent (which is the same as an occupancy rate of 58.4 percent), which produces an effective gross income of $69,344.  (*Id*.)  Leib then used actual reported expenses of 80 percent ($55,475) to arrive at a net

/ / /

---

[13] Defendant submitted a revised version of its Exhibit F, page 3, at trial, without objection by Plaintiff, and based on corrections made by the parties after considerable discussion of the data.

operating income of $13,869.  (*Id*.)  Capitalizing that income at a rate of 8.5 percent resulted in a

valuation of $163,164.[14]  (*Id*.)

> b.    Using the Market Data Approach

Leib then estimated the value under the income approach using *market data* (as opposed

to the subject property's financial performance).  (Def's Ex F.)  Leib used a potential gross

income of $118,740, which is the same figure Leib used in the approach discussed immediately

above (which is based on actual income rather than market income).  (*Id*. at 2.)  Leib applied a 15

percent vacancy rate ($17,811), to arrive at an effective gross income of $100,929.  (*Id*.)  Leib

then adjusted the effective gross income downward 35 percent, or $35,325, for expenses, to

arrive at a net operating income of $65,604.  (*Id*.)  Leib capitalized that net operating income at

8.5 percent to arrive at a property value estimate of $771,810.  (*Id*.)

## II. ANALYSIS

A.    *The Issue and General Guiding Principles*

The issue before the court is the real market value of the subject property for the 2013-14

tax year.  ORS 308.205(1)[15] defines real market value in part as:

> "Real market value of all property, real and personal, means the amount in
> cash that could reasonably be expected to be paid by an informed buyer to an
> informed seller, each acting without compulsion in an arm's-length transaction
> occurring as of the assessment date for the tax year."

The assessment date for the 2013-14 tax year was January 1, 2013.  ORS 308.007;

ORS 308.210.  Plaintiff has the burden of proof and must establish its case by a preponderance

of the evidence.  ORS 305.427.  This court has previously ruled that "[p]reponderance of the

---

[14] The court calculated a slightly higher valuation of $163,165 (rounded), but the $1 difference is insignificant and inconsequential.

[15] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2011.

evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971) (citation omitted).

Burden of proof requires that the party seeking relief (Plaintiff in this case) provide evidence to support its argument. The evidence that a plaintiff provides must be competent evidence of the requested real market value of the subject property in order to sustain the burden of proof. *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing [features or characteristics], and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers." *Betz Evans Associates v. Lane County Assessor*, TC-MD 110329C, WL 4714961 at *3 (Oct 4, 2012); *Toy Box Maxi-Storage LLC v. Jackson County Assessor*, TC-MD No 110339C, WL 1958943 at *3 (May 31, 2012); *see also Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005).

There are three standard methods of valuation in determining real market value, as prescribed by statute and administrative rule. ORS 308.205(2) states that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." The department's rule prescribes the following three methods of valuation: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. OAR 150-308.205-(A)(2)(a); *see also Allen v. Dept. of Rev. (Allen)*, 17 OTR 248, 252 (2003). The administrative rule requires that consideration be given to the three approaches to value (income, cost, and sales comparison), but they need not all be used. OAR 150-308.205-(A)(2)(a); *see also Allen*, 17 OTR at 252; *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995). The valuation approach or approaches to be used is "a question of fact to be determined by the court

upon the record." *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

B.      *The Court's Evaluation of the Parties' Evidence*

1.      *Sale of the Subject*

The sale of the subject property can provide a useful indication of the value of the subject property. *Kem v. Dept. of Rev. (Kem)*, 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted) (ruling that a recent sale of the subject property in question can be persuasive although not conclusive of a subject property's value). The Oregon Supreme Court in *Kem* ruled that "[a] recent sale of the [subject] property * * * is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is *very persuasive* of the market value." *Id*. (citations omitted) (emphasis added). However, the Court in *Kem* "emphasize[d] that a recent sale of the subject property is not necessarily *determinative* of market value and does not foreclose other methods of valuation[.]" *Id*. at 115 (emphasis added); s*ee also Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974). The two important considerations are whether the sale was "recent" and whether it was "arm's length." *Kem,* 267 Or at 114.

The sale in this case was recent, with the parties agreeing to a value in May 2013 and closing in July 2013. The agreed-upon purchase price was $410,000. Defendant contends that the sale is not arm's-length because Plaintiff purchased the subject property from a bank

following a foreclosure. The fact that the sale was a "foreclosure" does not necessarily mean that the sale is not a good indicator of value. Defendant's comparable sales approach included six sales, two of which were foreclosures, and one sold under an unspecified duress situation. (Def's Ex E at 1.)

The bank held title to the subject property for approximately 22 months before Plaintiff's purchase. It is true that "[t]his court has been reluctant to consider 'foreclosure' sales as 'arm's length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.' " *Voronaeff v. Crook County Assessor (Voronaeff)*, TC-MD No 110361C, WL 1426847 at *4 (Apr 25, 2012) (citations omitted). However, the Oregon Supreme Court found that a foreclosure sale may be "a voluntary bona fide arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward v. Dept. of Revenue*, 293 Or 506, 508, 650 P2d 923 (1982) (emphasis omitted). And, this court has observed that "[t]here are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk v. Lane County Assessor (Brashnyk)*, TC-MD No 110308, WL 6182028 at *5 (Dec 12, 2011). In *Brashnyk*, the court also noted that bank-owned property sales may be considered as comparable sales for the purpose of establishing real market value, "when those bank-owned property sales have been exposed to the open market and meet the 'nominal standards for an acceptable comparable sale.' " *Brashnyk*, 2011 WL 6182028 at *6. That principle applies with equal force when the bank-owned sale is the subject property.

The court finds Plaintiff's purchase price a good indicator of value in this case because the subject property was listed for sale by an experienced real estate company for approximately

17 months prior to Plaintiff's first purchase offer of $380,000.[16] However, it is not necessarily conclusive. (Ptf's Ex 3, Ex 5 at 1, 6.) In arriving at Plaintiff's purchase offer, Lepman prepared a seven-page purchase proposal, which considered the subject property's potential income generating capability, its physical problems, and high expense ratio. Lepman owns eight other ministorage facilities in this state and is very familiar with the market for such properties. Plaintiff's purchase proposal concluded that the subject property was worth $347,000. (Ptf's Ex 5 at 6.) Plaintiff nonetheless offered to pay $380,000 "as is." (*Id.*) The bank failed to respond to its offer. Lepman testified that six months after he had submitted Plaintiff's initial offer, the realtor marketing the subject property for the bank telephoned him, informed him that some repairs had been made to the subject property in an attempt to cure the leaky siding, and asked if Plaintiff was interested in submitting another offer. Lepman testified that, based on that information, and further reflection, Plaintiff increased its offer to $410,000 in May 2013. The parties ultimately agreed to the sale of the subject property for $410,000, with the sale closing July 31, 2013. (Ptf's Ex 6 at 1.)

The court finds significant the fact that at the time of Plaintiff's purchase, the subject property had a low occupancy rate (between 47 percent and 73 percent, but generally below 70 percent)[17] due to the water leakage problem, poor location, and competition from a nearby ministorage facility. The evidence supports Plaintiff's contention that the subject property is in a poor location. It is located outside of town, is not on any major roadway, is near the town's waste disposal transfer station, and in an industrial zone with a competing ministorage facility practically across the street. Most of that information came from Leib's trial testimony and value

---

[16] The property was listed for sale in April 2011, and Plaintiff submitted its initial $380,000 offer on October 7, 2012.

[17] The occupancy rates reported hereby the court come from Plaintiff's Exhibits 4 at 16, and 10 at 2.

report. According to the evidence, the neighboring facility had a high occupancy rate (95 percent) at the time of Plaintiff's purchase, meaning that the subject property had stiff competition for market share. (Ptf's Ex 3 at 2.) As for the location, the entrance to Plaintiff's ministorage facility is on SW Kathleen Street, which is a dead-end "side" street providing vehicular access to several commercial/ industrial properties. (Ptf's Ex 11 at 8-11; Def's Ex A at 4.)

2.      *Lepman's Pro Forma Value Estimate and Plaintiff's Purchase*

Lepman, the managing member of the Plaintiff LLC, and an Oregon certified appraiser who owns eight other ministorage facilities in Oregon, performed a pro forma estimate of the subject properties income based on the property's actual income and expense data and rental rates. He used that information to prepare a written purchase proposal for the subject property that he submitted to the owner that was selling the property. The proposal was dated October 7, 2012, and concluded that the real market value of the property at that time was $347,000. Plaintiff nonetheless offered to buy the property for $380,000 in October 2012. The owner rejected the offer, which was based on lender financing and Lepman's personal guarantee on the loan backed by his ownership of the other ministorage facilities.

Approximately seven months later, in May 2013, Plaintiff increased its purchase offer to $410,000 and the parties ultimately agreed on a sale price of $410,000 on July 31, 2013. The property was listed for sale at the time of Plaintiff's purchase by a real estate management and sales company, for $632,000.

3.      *Plaintiff's Appraisal*

Plaintiff also submitted a written appraisal report prepared by a qualified appraiser. While the court admitted that appraisal into evidence over Defendant's objection, which was

based on the fact that the author of the report, Haskell, was not present at trial or otherwise available to testify, the court has concluded that no weight should be given that document. Not only was the appraiser unavailable to testify, but the appraiser's methodology had some fundamental errors. Haskell's sales comparison approach relied on properties that sold for a wide range in value; from a low of $465,000 to a high of $1,740,000. Haskell also determined that the per square-foot value of the subject property based on a weighted average of his adjusted value range. Averaging is not the conventional method prescribed for valuing property. Haskell's income approach was a bit more conventional, but suffered from one serious flaw; Haskell included property taxes as an expense, which is not appropriate when valuing property for tax purposes. The correct approach is to include the property tax rate as a component of the capitalization rate. *Patterson v. Dept. of Rev.*, 13 OTR 320, 322 (1995) ("Taxpayer inadvertently duplicated expenses for property taxes" by including them both as an expenses and in its capitalization rate); *Morse Hayes, L.L.C. v. Benton County Assessor*, TC-MD 100697C, WL 2621890 *5 (2001) (noting "this court has indicated a preference for an income approach that removes property taxes from expenses and uses a capitalization rate that includes an effective tax rate for property taxes"). And, the amount included, $12,400, was more than $2,000 above the property's actual taxes. Finally, Haskell attributed more weight to his sales comparison approach which, as stated above, had a number of methodological problems.

4.    *Defendant's Appraisal*

Defendant valued the property using the three standard approaches to valuation. However, the court places no weight on two of Defendant's three approaches.

/ / /

/ / /

a.      Defendant's Sales Comparison Approach

Defendant's sales comparison approach has numerous problems.  Only two of the six comparable sales were built around the same time as the subject property - comparable sales one and six.  The other four are nine or more years older than the subject property.  Additionally, Leib acknowledged in her report, and testified at trial, that only two of the six comparable sales were open-market transactions.  One of Leib's two open-market sales, the Lighthouse 101 Mini Storage (comparable 2) is far superior to the subject property.  It consists of 10 separate buildings with "residential style siding, and asphalt shingle roofing."  That property has a total of 226 storage units, and the "yard" is completely paved with asphalt whereas the subject property has a gravel yard.  (Def's Ex E at 26.)  Three of Leib's six comparable sales differ dramatically from the size of the subject property, two being significantly smaller at 2,910 square feet and 9,140 square feet (comparables 4 and 5), and one more than three times larger (comparable 6).  Leib's sixth "comparable" sale is far superior to the subject property and not truly comparable.  Leib noted in her appraisal report that her comparable six "is a good example of the highest end of our mini storage market."  (Def's Ex E at 5.)  Leib testified that the property was "unique," in that the exterior back walls of the ministorage buildings essentially form a wall that encloses the property.  Her report stated that "[t]he building's exterior walls enclose the site, with the exception of the [gated] key pad entry area."  (Def's Ex E at 5.)  The photographs submitted by Defendant vividly depict the unique and superior quality and appearance of the property, which includes some exterior stone façade siding and a wrought iron gated entrance that add to the curb appeal of the property.  (Def's Ex E at 67-69.)  That property sold in April 2014 for $2,548,000 and has a total of 52,179 square feet of storage area, plus a nearly 1,100 square foot office area and a 1,700 square foot manager's apartment with a 552 square foot attached garage.  (Def's Ex

E at 5.)  The sale price, on a per-square-foot basis, was $45.89.  (*Id*.)  That figure has the effect of skewing Defendant's final value estimate because Leib took the average price per square foot from her six comparables to arrive at a per-square-foot value for the subject property.  (Def's Ex E at 5-6.)  The court also notes that, although Leib objected to Plaintiff's reliance on its purchase price because Plaintiff bought the subject property from a bank, Leib's comparable 6 was also a bank foreclosure sale property managed by the bank for the 13 months prior to the sale in April 2014.  (Def's Ex E at 5.)

Finally, Leib's value estimate was based on average price per square foot, with no adjustments made for any differences between the comparable sales and the subject property. Because sales are seldom comparable in every detail, adjustments that reflect differences must be considered.  *J. R. Widmer, Inc. v. Dept. of Rev.*, 4 OTR 361, 366 (1971), *aff'd* 261 Or 371, 494 P2d 854 (1972).  "In evaluating the competing evidence, the court looks to the comparability of the different sales and the application of all necessary adjustments for differences.  Adjustments are a key component in evaluating properties."  *Redus Redmond OR Land LLC v. Marion County Assessor*, TC-MD 130141D, WL 4744777 *5 (2013), quoting *Voronaeff*, 2012 WL 1426847 at *3.  For all the reasons stated above, the court cannot place any weight on Defendant's comparable sales approach.

b.    Defendant's Cost Approach

Leib's cost approach is unreliable because her land value comparables were much smaller than the subject property and two of the three are non-arm's length.  Leib's cost approach separately valued the structures and the land.  Defendant's cost analysis of the structures would appear to have some merit, but the approach suffered somewhat due to the fact that the subject property is six years old.  As this court has noted in the past, the cost approach,

"is especially persuasive when land value is well supported and the improvements are new or suffer only minor depreciation and, therefore, approximate the ideal improvement that is the highest and best use of the land as though vacant." *The Appraisal of Real Estate* at 382; *see also Magno v. Dept. of Rev.*, 19 OTR 51 at 55 (2006). In this case, the subject property is not "new," and has a number of factors that negatively impact it, including the problem with water intrusion and location. More importantly, Leib's land value is not "well supported" because Leib only used three sales, all of which are significantly smaller than the subject property, and two of which are post-assessment date transactions.

c.      Defendant's Income Approach

That leaves Defendant's income approach. In her income capitalization approach, Leib relied on potential gross income of $118,740 and a vacancy rate of 15 percent. (Def's Ex F at 2.) That gave Leib an effective gross income of $100,929. (*Id*.) Leib applied a 35 percent expense ratio to arrive at a net operating income of $65,604. (*Id*.) Leib capitalized her net income at 8.5 percent, which resulted in a property value estimate for the subject property of $771,810. (*Id*.)

The court has concerns with Defendant's valuation under the income approach. Among the court's concerns of the following. The occupancy rate for the subject property was, for the most part, 70 percent or less between January 2012 and August 2014. (Ptf's Exs 4 at 16; 10 at 2.) That equates to a vacancy rate of 30 percent or greater. Yet, Defendant used a vacancy rate of 15 percent in its income approach. (Def's Ex F at 2.) Leib's capitalization rate strikes the court as low for the subject property because both prior to and after the January 1, 2013, assessment date and up to the time of Plaintiff's purchase on July 31, 2013, the property suffered from numerous problems that equate to risk for a prospective buyer because the subject is an

income producing property. *CLP Elements LLC v. Benton County Assessor*, TC-MD No 110559N, WL 1267655 at *9 (2012) (recognizing that additional risk supports selection of higher capitalization rate). Increasing conservatively Defendant's vacancy rate to 20 percent, and increasing Defendant's expense ratio to 50 percent, reduces the indicated value to $474,950.

C.      *Reconciliation*

The court rejects Defendant's cost approach and sales comparison approach, and gives no weight to Haskell's appraisal for the reasons set forth above. Where does that leave things?

Plaintiff paid $410,000 for the subject property. That is a known number. Plaintiff likely got somewhat of a deal on the subject property because it bought the subject property from a bank after a foreclosure and the lending institution had been in possession of the subject property since September 19, 2011. (Ptf's Ex 1 at 1.) Lepman testified that Plaintiff submitted its $410,000 purchase price offer in May 2013, which was nearly 21 months after the bank acquired the subject property through foreclosure. The outstanding balance on the loan to the prior owner at the time of foreclosure was $711,842. (*Id.*) The list price at the time of Plaintiff's purchase was $630,000. (Ptf's Exs 3 at 1, 11 at 2.) Those factors suggest that the lender had an increasing motivation to sell the subject property. The court's supposition on that point is buttressed by the fact that Colm, the company marketing the subject property for the bank, called Plaintiff six months after the bank rejected his initial $380,000 offer, to see if Plaintiff was interested in submitting another offer. While that might be viewed as an indication of duress on the part of the bank, the court finds that not be the case here. The bank had the subject property professionally managed and marketed, and apparently received no offers for the $630,000 list price or any amount above Plaintiff's $410,000 offer, which the bank accepted. If there had been

/ / /

a higher offer made, the bank apparently would not or could not accept it. Regardless, there is no evidence to suggest any higher offers were made.

Defendant appraised the property under the income capitalization approach. However, the income capitalization approach, by its very nature, has many built-in assumptions or estimates, which are supposed to be derived from market data, but in this case, are a composite of actual figures for the subject property and market data. Defendant's extremely low value estimate of $163,164, based on the subject property's actual operating performance verses Defendant's $771,810 "market value" estimate supports Plaintiff's assertion that the subject property had not reached stabilization at the time of Plaintiff's purchase. That weakens the weight the court gives to the income approach. And, as indicated above, the court finds Defendant's vacancy rate unreasonably low for the subject property given the evidence presented, and Defendant's expense ratio low as well. Defendant did not provide the court with persuasive evidence to support its figures. The court made slight adjustments to those two numbers and ended up with a value estimate of $474,950. And, given the fact that the actual vacancy rate at the time of purchase and for months prior to and thereafter was closer to 30 percent, that court-adjusted figure is likely on the high end of the value range for the subject property.

Based on a review of the evidence, the court finds that the real market value of the subject property, as of the January 1, 2013, assessment date, was $466,000.

D.    *Closing Comments*

The court's value conclusion might appear, at first blush, to be low for a four-building ministorage facility with an on-site manager's combination home and office, all of which is situated on 4.3 acres of land. Lepman, who owns a number of other ministorage facilities and is

an appraiser, presented a very well-organized and compelling case with documentary evidence tending to support his value opinion, and responded well to Defendant's cross-examination questions and criticisms. By contrast, Defendant presented a report that appears persuasive on its face, but when analyzed in light of Lepman's cross-examination, turns out to be unpersuasive for a number of reasons. Lepman effectively established that, notwithstanding the fact that Plaintiff bought the subject property from a bank, the transaction was arm's-length, lacking the amount of duress often associated with bank owned properties, given the problems the subject property has, both physically and locationally.

### III. CONCLUSION

The court concludes that the real market value of the subject property, as of the January 1, 2013, assessment date, was $466,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted, the real market value of the subject property, identified as Account R509910, is $466,000 as of January 1, 2013.

Dated this ___ day of January 2015.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this final decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the final decision or this final decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Dan Robinson on January 16, 2015. The court filed and entered this document on January 16, 2015.*