## LOUIS J. FEVES *v.* DEPARTMENT OF REVENUE

Arthur R. Barrows, Attorney at Law, Pendleton, represented plaintiff.

Ted E. Barbera, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered February 18, 1971.

CARLISLE B. ROBERTS, Judge.

Plaintiff, as trustee, is one of the taxpayers on account of improved real property described as 2N 32 02CC, Tax Lot 3800 in Pendleton, Oregon. The land can be described as containing four contiguous 50 by

50 foot units, arranged in an "L shape," with 50-foot frontages on two streets. It is the site of a building, known as the "Byers Avenue Medical Clinic," a single-story, concrete block structure, built in 1952 (containing approximately 2,700 square feet) and enlarged in 1966 (to total 3,800 square feet), and an asphalt-topped parking lot. The taxpayer appeals from the Department of Revenue's Order No. VL 70-54, dated February 13, 1970, confirming the determination of the Assessor of Umatilla County and the Umatilla County Board of Equalization that, on January 1, 1969, the subject property had a true cash value of $62,000, of which $17,500 was attributable to the land and $44,500 to the improvements. The plaintiff asserts that the fair market value of the improvements was $26,000 and agrees to the value of $17,500 placed upon the land.

At the trial, Mr. William Scharn, an independent real estate appraiser, testified for the plaintiff and Mr. Donald Fonda, Chief Appraiser, Umatilla County Assessor's Office, testified on behalf of the defendant. Both men qualified as expert witnesses. They agreed that comparable sales were unavailable for purposes of ascertaining the value of the improvements of the subject property by using the market data approach to valuation. (See *Portland Canning Co. v. Tax Com.*, 241 Or 109, 404 P2d 236 (1965).) They had no difficulty in obtaining sales of comparable land and were able to agree upon $17,500 as the value of the land alone.

Each appraiser used both the cost approach and the income approach to determine the value of the improvements but particularly stressed the income approach. This latter method is standard as a substitute for the market data approach where sales are

lacking and the property is designed for the production of income. See Friedman, *Encyclopedia of Real Estate Appraising* 36 (Rev & Enlarged Ed 1968):

> "The Income Approach to real estate evaluation is a method of estimating value, based on factual data with respect to the income yield of the property. It is a method of estimating the present worth of the benefits to be reaped from the property in the future. The method is also known as the 'capitalization approach' because the income derived from the property, generally net annual income, is reduced to an indication of value by a mathematical process or computation known as 'capitalization.'
>
> "Income consists of recurrent periodic benefits or 'returns' arising through ownership and resulting from a capital investment in real estate. The major investment properties consist of multi-family apartment houses and office buildings. The Income Approach is most frequently and most effectively used in estimating the value of such properties. * * *"

In the treatise of the American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 267-268 (5th ed, 1967), the principal problem in utilizing the income approach is clearly illustrated:

> "The selection of the over-all capitalization of interest yield rates is one of the most important tasks of the appraiser. Rates should be selected with utmost care, on the basis of market experience. A variation in the rate can produce a wide variation in estimating the magnitude of the value, as the following simple illustration demonstrates:

| Net Income | Value at 7% | Value at 8% | Percent Decreased Value | Percent Increased Value |
|---|---|---|---|---|
| $500 | $7,143 | $6,250 | 12.5 | 14.3 |

> "At the above interest rates, a decrease in the rate of 1% makes an increase of 14.3% in the

value estimate. An increase in the rate of 1% makes a decrease of 12.5% in the value estimate.

"Generally the rate to use in an appraisal problem is the rate which investors in that type or class of property require as a condition for purchasing. The rate which such investors require varies from time to time depending upon economic conditions. Accordingly, the appraiser must carefully consider competitive market conditions, because they influence the opinions and actions of investors."

In the present case, the plaintiff's expert witness capitalized at eight percent and found a true cash value for the improvements of $26,000. The plaintiff's final conclusion of value based on the cost approach was a total of $44,850, indicating $27,350 ascribable to the improvements. The defendant's appraiser capitalized at seven percent and, having obtained an estimate of total value of $68,790 by the income approach, and an estimate of $66,150 by the cost approach, and deducting $17,500 for the land, he "arrived at an estimate somewhere between those two of $50,000 on the improvements * * *."

In addition to the rate of capitalization, already mentioned, different treatment of other factors gave rise to the substantial disparity in the appraised values found. The plaintiff gave a 40-year life to the building, the defendant 60 years; the plaintiff found a reasonable rental value among similar properties to be $1.80 per square foot, the defendant $2.55 per square foot; the plaintiff deducted $1,715 of expenses from gross income to give a net income of $4,783 per year, for capitalization purposes, and the defendant allowed $1,407 of expenses to arrive at a net income of $8,283 per year. Other differences, of less significance, could be cited. In their search for "compar-

ables" on which to base studies of local values, the parties considered the same buildings but differed greatly on degrees of comparability of these buildings.

Plaintiff's income approach (corrected to overcome small arithmetical errors) was based upon the rental income of the improvement's 3,800 square feet at $1.80 per square foot, for a gross of $6,840. From this was deducted expenses for management, real estate taxes, insurance and the reserve for replacements in the sum of $1,715, leaving a net income of $5,125.

Plaintiff developed an eight percent capitalization rate, using the component rate method, on the basis of a "safe rate" of 4.5 percent to which was added 1.25 percent because of the additional hazard of the investment as against a safe rate, 1.25 percent for the nonliquidity of the investment and one percent for the cost of management. With an agreed land value of $17,500, capitalized at eight percent, the income of the land would be $1,400, leaving income attributable to improvements of $3,725. Since, in addition to the eight percent return, the taxpayer is entitled to recapture his investment in the wasting improvements which the appraiser deemed to have a remaining useful economic life of 20 years, five percent must be added to the eight percent for that purpose and the $3,625 must therefore be capitalized at a 13 percent rate. This results in a value of $27,900 for the improvements which, added to the $17,500 value for the land, gives a total value of $45,400.

The chief appraiser for the county developed an income from rental at $2.55 per square foot for the 3,800 square feet, totaling $9,690. Of this income, he attributed $1,677 to the land value of $17,500, based upon a capitalization rate of seven percent to which

was added 2.58 percent representing the expense of property taxation, based upon the average tax rate for the area in the year 1968. To the remainder of $8,013 of income, he charged five percent ($485) for vacancy and $922 for insurance, repairs and other expenses to the improvements for a total of $1,407, leaving $6,606 to be capitalized. He added the seven percent interest rate and the 2.58 tax percentage to a 3.3 percent recapture rate, based on a 60-year life for improvements, for a total rate of 12.88 percent, resulting in a value of $51,290 of improvements, or a total value for land and improvements of $68,790.

The court finds weaknesses but no outright errors in either of these exercises in the income approach.

The plaintiff's witness based his rental value, according to the record, upon a study of the deRomanett Building, with an annual gross rent per square foot of $1.70, and the Wells Building, rented at $2.58 per square foot. He rejected the Lorenzen Building as a comparable because the rentals of $2.94 per square foot included items not normally chargeable to the property (i.e., water, heat, lights). The plaintiff rejected the Hachler and Hess buildings because their differences from the subject property required too many adjustments. Without detailed explanation, he reached a conclusion as to the estimated rent of the subject property at $1.80 per square foot. On the other hand, defendant's rental studies included all the buildings mentioned and, though containing many of the subjective adjustments which are the bane of property taxation, the record of the witness' testimony, bolstered by redirect examination, overcame an initial impression that he was merely striking averages.

Neither the plaintiff's nor the defendant's deductions for expenses (to obtain net income) were well

documented. The defendant appeared to include as expenses some items (light, water, sanitation) properly attributable to the tenant, not to the operation of the building. However, the record does not show clearly whether or not this affected his results.

According to plaintiff's testimony, $1,715 would cover real estate taxes, insurance, reserve for replacement and miscellaneous expenses. Taxes alone would amount to some $1,100 at the plaintiff's proposed value. However, since taxes depend upon valuation and this is the unknown quantity which must be found, the expedient usually followed is to develop a percentage for taxes which is added to the capitalization rate. The defendant followed this procedure. (This seems a questionable practice, since if error is made it is greatly multiplied, but the custom is widely followed in Oregon.)

The plaintiff's capitalization rate of eight percent could be more defensible than the seven percent rate used by defendant, considering the quality of the subject property. See *Fitzgerald, Administrator v. Commission*, 3 OTR 447 (1969). The importance of the capitalization rate has been mentioned above.

The period for recapture for the investment in the improvements has already been noted. While it is undoubtedly true that the nature of the construction of the improvements on the subject property will have a physical life of 60 years, the observable rapid changes in the culture argue that the 40-year economic life is reasonable. All aspects of the income approach must be considered by the appraiser exactly as the informed investor would view them.

It is interesting to observe that if the stronger points of each appraiser's projection for the income approach are utilized, the value obtained is very close

to the $62,000 approved by the board of equalization and the Department of Revenue. The assumptions here are a rental value of $9,690 (based upon an average rental value of $2.55 per square foot as found by the defendant) and deduction of the expense figures used by the defendant of $1,407. The computation of the capitalization rate would be that of the plaintiff with the addition of 2.58 for property taxes and with an economic life remaining of 20 years, requiring a five percent per year recapture. This gives a net income of $8,283 of which $1,654 is attributable to the land only (capitalized at a rate of eight percent plus 2.58 percent for taxes), leaving a balance of $6,629 attributable to the improvements which is divided by 15.58 percent (eight percent plus 2.58 percent plus five percent for recapture of improvements), leading to a rounded total of $42,500 value for the improvements which, added to $17,500 for land, gives a total value of $60,000.

The chief factor in the difference between the replacement cost approach between the parties was in the use by the plaintiff of a building cost of $14 per square foot as against the defendant's $16.07 per foot. The second important factor was the difference in depreciation. The plaintiff decreased the reproduction cost by $26,600, based upon a remaining useful economic life of 20 years; the defendant reduced the replacement cost by $14,236, representing 10 percent economic obsolescence and 15 percent physical depreciation. (The defendant's appraiser testified: "These percentages aren't added together and reduced from the 100 percent, but rather the percent good is multiplied together so I come up with 77 percent good, rather than 75 percent as might be indicated.")

The defendant's witness, utilizing the cost approach, used the factor book that is furnished by the Department of Revenue and "I came up with this square footage replacement cost of $16.07." This gave a total replacement cost of $61,916, which was diminished by depreciation and obsolescence as described above. In addition to the building itself, he found a depreciated value of $970 for the 5,873 square feet of asphalt paving in the parking area (using a replacement cost of 22 cents a square foot, depreciated at 25 percent).

The plaintiff's witness estimated the replacement cost of the physical structure as follows:

"* * * I had contacted at least two or three different building contractors for their estimate of replacement cost of this type of building—that is, a block building with the major items of construction. I am in constant contact with builders throughout the area. And then I referred to Marshall-Stevens and based on the description of the building as they would have it in their various descriptions and the one that fit most closely would be considered. I certainly tempered their figures with some information which came from the contractor and some of my own background. Also their figures are based on various cities up and down the coast and then they have adjustments for Pendleton, Baker, and so on. My final conclusion of replacement cost was $14 per square foot. * * * Then I considered the asphalt paving which consisted of 6,000 square feet and the replacement cost new—this is 31 cents per square foot or $1,860. Now this I figured had a different effective age. It is certainly not the same type of construction. Indications were by various investigations that this had an effective age of about 12 years and a normal life would be 20 years. So it had depreciated some 60 percent, or a remaining value of $1,116

—or a depreciation of $1,116—remaining value of $744. * * *"

The court has experienced great difficulty in this case in evaluating the testimony found in the record since neither appraiser sufficiently vouchsafed the bases presumably underlying much of the data offered. There was a lack of itemization in the cost approach. In the use of the income approach, the differences in economic life of improvements, the capitalization rate, and comparable rents were independently asserted by each witness but not fully explained. The income data were too sketchy. "The net income to be capitalized will reflect a true picture only if the expense to be deducted is developed in as logical and careful fashion as are gross income and effective gross income estimates." *The Appraisal of Real Estate, supra,* 244. The court is here required to weigh diverse conclusions, any one of which could be true and all of which could be wrong, using assumptions of the witnesses which, if not naked, were at best scantily garbed. Plaintiff's determination of economic gross income may be too low; defendant's may be too high. Mr. Justice Cardozo, as usual, neatly states the dilemma (quoted in *Roseburg Lbr. Co. v. State Tax Com.,* 223 Or 294, 310, 355 P2d 606 (1960)):

"'* * * The difficulty is that it [substitute 'plaintiff' or 'defendant'] has not said so with the simplicity and clearness through which a halting impression ripens into a reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. * * *'"

In coming to a conclusion as to the fact of the true cash value of the subject property on January 1, 1969, (the only issue in the case), the court begins by

"* * * resorting to the presumption that of-

ficial duty has been regularly performed (§ 9-807, Oregon Code 1930) [now found in subsection (15), ORS 41.360] which of necessity includes a disputable presumption that the public officer has reasonably exercised his discretionary power: [citing cases]. * * *" *Ring v. Patterson*, 137 Or 234, 240, 1 P2d 1105 (1931).

■■■ The plaintiff, in the opinion of the court, made a prima facie case, but proved no substantial error in the defendant's assessment methods. While the defendant's evidence left in doubt the ultimate fact of the true cash value of the improvements, it would appear that, in this state of the record, evidential value must continue to be given to the presumption. *Wyckoff v. Mutual Life Ins. Co.*, 173 Or 592, 596, 147 P2d 227 (1944). The plaintiff has the burden of proving his case by a preponderance of the evidence in the face of the presumption of assessment validity. ORS 305.427; *Strawn v. Commission*, 1 OTR 98 (1962), *Lundeen v. Commission*, 2 OTR 13 (1964). Preponderance of the evidence means the greater weight of evidence, the more convincing evidence. See *McPherson v. Cochran*, 243 Or 399, 404, 414 P2d 321 (1966). The court is not satisfied that the record in the present case is complete but there is no doubt in its mind that the presumption in favor of the defendant has not been overcome.

Defendant appears to have relied in some degree on the consideration evidenced by a deed (Defendant's Exhibit A) dated October 15, 1958, conveying an undivided one-third interest in the subject property for $22,000. This evidence has been rejected by the court because of the testimony showing that a proprietary interest in a going concern, as well as land and building, were involved in the transaction.

Defendant's Order No. VL 70-54, setting a total value of $62,000, is sustained, the plaintiff's complaint is dismissed and the defendant is entitled to its costs herein.