# J. R. WIDMER, INC., an Oregon Corporation, and WALTER J. WIDMER *v.* DEPARTMENT OF REVENUE

362

Robert A. Leedy, Barzee, Leedy & Tassock, Portland, represented plaintiff.

Glen V. Sorensen, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered April 13, 1971.

CARLISLE B. ROBERTS, Judge.

The plaintiffs appeal from the Department of Revenue's Order No. VL 70-242, dated June 25, 1970, which affirmed the order of the Multnomah County Board of Equalization, establishing the true cash value as of January 1, 1969, of four parcels of improved real property located in the East Portland Addition, more specifically described as follows:

(1) Lots 1, 2 and 3 and all except the south 12 feet of Lot 4, Block 156, East Portland, Accounts Nos. 1-22651-0450 and 1-22651-0470, assessed at $108,500. The northern half of the property is improved by a modern office-warehouse building, leased to Hotpoint; the south half is asphalt-covered parking area.

(2) The south half of Lots 2, 3 and part of Lot 4, Block 147, East Portland Addition, Account No. 22650-9370, assessed at $58,500. This land is leased as a used car lot and is improved by asphalt topping, a cyclone fence, and a small portable office building.

(3) The east 30 feet of Lot 8, Block 156, East

Portland Addition, Account No. 22651-0540, assessed at $6,300. This is a corner lot, on the northeast corner of the block, improved with a one and one-half story single family dwelling, with basement, at least 50 years old but well maintained.

(4) The west 30 feet of Lot 8, Block 156, East Portland Addition, Account No. 1-22651-0530, assessed at $5,800. The improvement thereon is almost identical to that of parcel (3), which it adjoins. (The plaintiffs also own similarly improved property, lying between the fourth parcel and the first parcel, the value of which is not in dispute.)

The plaintiffs contend for a true cash value as of January 1, 1969, of these parcels, respectively, as follows: $81,400; $36,900; $5,500; and $5,500.

J. R. Widmer, Inc., is a family corporation which apparently owns a considerable amount of property in the East Portland Addition. Mr. J. R. Widmer, one of the plaintiffs and the only witness appearing on behalf of the plaintiffs, is a vice president and secretary-treasurer of the corporation. Mr. Widmer's father founded Widmer Plumbing and Heating Company 65 years ago, first located at Grand Avenue and Couch Street, only two blocks from the subject properties. Mr. Widmer, the witness, was born nearby and lived in the area for many years and has carried on business there all of his life. His father began purchasing property in the neighborhood at an early date and the son has a great familiarity with the history of the neighborhood and property transactions which have taken place over the years and up to this time. He is active in managing and developing the family properties and his own.

In his Opinion and Order No. VL 70-242, the Director of the Department of Revenue stated:

"The County supported the assessment of the subject land through market data and the assessment of the subject improvements by the cost approach. Petitioner, on the other hand, submitted little evidence of probative value in support of its contentions concerning the assessment of the subject improvements. Other than an expression by Mr. Widmer of his opinion of the subject land's true cash value, Petitioner's principal evidence was an attack by Mr. Widmer on the comparable sales submitted by the County.

"Although the Director finds merit in some of Mr. Widmer's criticism of the comparability of the sales used to support the assessed valuation, it is the opinion of the Director that Petitioner has failed to show that the comparable sales are not indicative of the true cash value of the subject property. Mr. Widmer testified that he has spent virtually all of his life operating businesses and buying and selling property in the area of the subject property. Despite this, Mr. Widmer failed to cite one sale of property in the area of the subject properties which would support the value Petitioner contends to be the properly assessable figures. The Director recognizes that all land is technically unique, but the record does not show the subject properties to be measurably different than other properties within the same area."

The court viewed the subject properties, heard the testimony and has completely reviewed the record. What has been said in the Director's order could be paraphrased here, with two exceptions; i.e., in this court the county used an income approach (comparative rentals reduced to a square foot basis) on three parcels of the subject property and a cost approach on the used car lot to support its assessed value of

improvements and the plaintiffs submitted five sales of properties alleged to be comparable to the subject property.

Although the plaintiff's sole witness is capable and intelligent, experienced in business and property management, unusually knowledgeable in the history of the neighborhood of the subject properties and appreciative of high quality tenancy, he appears not to be an expert witness in the field of property tax appraisals. For example, he testified without contradiction to the measurements of a number of sites and the improvements thereon, but he failed to show relationships based on some common denominator that would make meaningful his testimony of various asserted comparables. The court's respect for the sincerity and integrity of the witness leads it to comment on the applicable law and testimony in some detail, in hopes of being helpful to him and others in a similar situation.[1]

██ It is necessary in this case to find the "true cash value" of the subject properties as of January 1, 1969. ORS 308.215 (3). "True cash value" equals "market value." ORS 308.205. "Market value" has been given a classic definition in the Department of Revenue's regulation, R308.205-(A), pursuant to ORS 308.205. It is to "be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue." The taxpayer who seeks to overturn the assessor's findings should have a clear concept of the assessor's methods,

---

[1] Among useful explanatory texts are: Bonbright, *Valuation of Property* (The Michie Co., 1937, reprinted 1965) (a treatise on the appraisal of property for different legal purposes); American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* (5th ed, 1967); Friedman, ed., *Encyclopedia of Real Estate Appraising* (Prentice-Hall, Inc., Rev. & Enlarged Ed, 1970).

imposed upon him by the department's regulations. Further, he should distinguish between "market value" and "market price."[2] "Market price" is best defined as the actual dollar price put on a property at the time of a transaction. This may be higher or lower than the value which an individual appraiser might place on the property. The difference may be due merely to differences of opinion or it may be due to some special consideration of a particular buyer or seller or due to problems in financing. Since one transaction does not make a market, the assessor must use many sales and seek the median. "Market value," then, is *representative* of the market. (An examination of the department's regulations relating to sales ratio studies is enlightening in this context. See R309.028-(C).)

As stated in the second part of regulation R308.205-(A):

> "Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances."

■ The presumption of assessment validity aids the defendant's determination. ORS 41.360 (15). The plaintiff has the burden of proving its case by a preponderance of the evidence (ORS 305.427) in the face of this evidentiary presumption. *Wyckoff v. Mutual Life Ins. Co.*, 173 Or 592, 596, 147 P2d 227 (1944); *Lundeen v. Commission*, 2 OTR 13 (1964).

Each of the three approaches to value referred to in the regulation is quite technical. Each requires a

---

[2] See 1 Bonbright, op cit, pp 29 et seq; Friedman, op cit, pp 5-7.

painstaking search for data and the use of tried procedures in order to obtain convincing results.

■■■ The testimony of the plaintiffs' witness, although lengthy, can be evaluated in six different categories:

(1) Much of the testimony related to the history of the neighborhood and of the subject properties. Although illuminating, it has no probative value in and of itself.

(2) The witness, as an owner, offered his personal opinion as to the value of each property. Although admissible evidence, these conclusions have weight only as the foundations on which they rest appear sound.

(3) Some testimony and exhibits in the form of pictures stressed a neighborhood "blight" consisting chiefly of the very intrusive power poles and wires and the arcades which characterize certain old buildings on East Burnside Street. However, there was no actual showing of the adjustments to be made in values on account of such defects and they were equally applicable to acceptable comparable properties used in evidence. Through the use of such comparables, the effect of the blight was taken into account by the defendant.

(4) The testimony of the witness suggests a faulty understanding of the term "highest and best use," which, of necessity, was often used by the parties. As stated in Friedman, *Encyclopedia of Real Estate Appraising*, (Prentice-Hall, Inc., Rev & Enlarged Ed, 1970) 8:

"* * * The appraiser must examine the physical aspects of the property, its functional desirability, and whether the property and the use to

which it is put are compatible with its surroundings. In addition, he must consider other uses to which the property may be adaptable, for these may have a significant effect on its market value if such alternate uses are legally permissible. Each appraisal requires a study by the appraiser as to the property's 'highest and best use,' which has been defined as 'the most profitable use to which. the property can be put, or that use which will yield the highest return on the investment.' "

The reason for the rule, of course, is that a tax shelter cannot be given to an investor, at the expense of the commonwealth, because he fails to develop his land to its fullest potential. The rule must be followed even though the taxpayer is not able to obtain necessary capital to utilize the land fully. A reading of the testimony suggests that the plaintiffs recognize that there is a rule and that they are making their best efforts to achieve highest and best use, but there is an inference that such efforts are all that is required, and some diminution of value should be allowed in the circumstances.

(5) The plaintiffs' witness, in establishing the values of the subject properties, appeared to use an income approach. Some testimony was given as to the gross rentals and some of the expenses. The testimony was presented in a haphazard, unorganized manner. No basis, ground or point of reference was established for use as a standard to determine the significance of the rental as an aspect of value.

■ The income approach to real estate valuation is an acceptable method. It is highly technical. The witness used only the name, not the method. This is not sufficient. See *Feves v. Dept. of Rev.,* 4 OTR 302

(1971). (Treatises cited in footnote 1 explain in detail the method and its problems.)

■ (6) In the defendant's Opinion and Order, which gave jurisdiction for the present appeal, mention is made of the failure of the plaintiffs to submit comparable sales at the time of hearing. The market data approach is required in the assessment of property when a market and usable comparables exist. *Portland Canning Co. v. Tax Com.*, 241 Or 109, 113, 404 P2d 236 (1965). The plaintiffs' witness testified in this suit to facts relating to five properties, all located on East Burnside in the neighborhood of the subject properties, alleging comparability. The defendant submitted acceptable comparable sales. The "market approach" or "market data" approach is most easily comprehended as the amount a willing buyer would pay a willing seller but it, too, has its technical aspects. Friedman, *Encyclopedia of Real Estate Appraising, supra*, ch 2. An absolute and minimum essential in comparing the subject property with comparable properties, recently sold, is to make adjustments for differences between the properties (since no two properties are identical) to reach some common denominator or basis from which comparisons can be made. The subject property itself can be a benchmark or, in proper cases, net rental per square foot, sales price per square foot, sales price per front foot, or some other measure proper in the circumstances can be utilized. The witness failed to tie his comparables to the subject properties. On the basis of the testimony, carefully read, one could infer that the testimony was submitted, not to prove comparability, but to suggest that the county's appraisers, as a rule, set up assessed values in excess of sales prices for particular properties. (If this was the aim, the data were insufficient. Furthermore, the testimony

shows that the plaintiffs were owners of other substantial properties in the neighborhood whose assessments were not in dispute. They were protesting selected assessments, not all assessments.) The witness made no effort to break down asserted values between the land and the improvements thereon and this made it impossible for the court to use the data given to determine values of land or improvements by using other testimony which was placed in the record.

It is noted that defendant's testimony also had some fragile aspects from an evidential standpoint. Plaintiffs' cross-examination helped to reveal that defendant's first two comparables, although close to the subject properties geographically, appear to be located in an essentially different neighborhood, thus losing a degree of comparability. The sales dates of some comparables were quite remote, diluting their force as evidence (but the plaintiffs also erred grievously in this respect). The data supporting value of improvements by use of rentals was not sufficiently spelled out (see *Feves v. Dept. of Rev., supra*) but was not challenged. However, in addition to the presumption of assessment validity, the assessor's valuations were sustained by testimony evidencing careful study, using traditional approaches, reducing values of comparable properties to dollars per square foot, all tending to show that the plaintiffs' properties were not over-assessed as of January 1, 1969.

The defendant's Order VL 70-242, sustaining the valuations used by the county's Department of Assessment and Taxation and the county board of equalization, is affirmed.