IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

EDUARD WEBER and MARIE A. WEBER,  )
Trustees of the Eduard Weber and          )
Marie A. Weber Revocable Trust,          )
                                         )
                 Plaintiffs,             )     TC-MD 150195C
                                         )
        v.                               )
                                         )
LANE COUNTY ASSESSOR,                    )
                                         )
                 Defendant.              )     **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered January 8, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiffs appeal the real market value of property identified as Account 1521903 (subject property) for the 2014-15 tax year. A trial by telephone was held on November 4, 2015. David Carmichael, attorney, appeared on behalf of Plaintiffs. Plaintiff Eduard Weber (Weber) and Ken Broughton (Broughton), a licensed and certified real estate appraiser and principal broker with 40 years of experience appraising property, testified for Plaintiffs. Faith Bowlsby, Appraiser III, Lane County Department of Assessment and Taxation, appeared and testified on behalf of Defendant. Plaintiffs' Exhibit 1 was received without objection. Defendant's Exhibit A was received without objection. Plaintiffs' Rebuttal Exhibit 1 was received without objection. Portions of Defendant's Rebuttal Exhibits B through G were received over Plaintiffs' objection and other pages within those exhibits were excluded because Defendant was unable to authenticate the contents.

/ / /

## I.  STATEMENT OF FACTS

A.    *Physical Description of the Property*

The subject property is a 4,400-square-foot (rounded),[1] high-end, custom-built, two-story, single-family home that includes 342 square feet of finished attic space.  (Ptfs' Ex 1 at 3, 7; Def's Ex J at 5.)  The home is situated on a 0.3-acre (13,068 square feet) fenced lot in the Ferry Street Bridge area of Eugene, overlooking a riverwalk path and the Willamette River beyond.  (Ptfs' Ex 1 at 3.)

The home has four bedrooms, four bathrooms, four fireplaces, a hot tub, a spiral staircase leading to the second story, two "Swarovski" chandeliers (one in the entryway and the other in the formal dining room), a cherry wood library, marble counters in the kitchen and bathrooms, tile and carpet floors, and an 899-square-foot, attached, three-car garage.  (*Id*. at 3, 12, 13, 15-17, 19; Def's Ex J at 5, 20, 23.)  The home was built in 1994.  (Ptfs' Ex 1 at 3; Def's Ex J at 1, 5.)  The rear of the home has a small, exterior, second-story deck overlooking a concrete patio behind the home and the back yard and river beyond, with a walkway from the rear patio around to the front of the house.  (Ptfs' Ex 1 at 18, 21-22.)  The home's exterior is finished in stone and wood, with a cement tile, gable-hip roof.  (Ptfs' Ex 1 at 3; Def's Ex J at 5, 23.)

B.    *The Roll Value and Parties' Value Requests*

The initial real market value found by Defendant for the 2014-15 tax year was $1,038,208.  (Ptf's Compl at 2.)  Plaintiffs appealed that value to the county board of property tax appeals (board) and the board reduced the real market value to $836,950.  (*Id*.)  Plaintiffs appealed the board's value to this court, requesting a reduction to $638,725.  (*Id*. at 1.)  Plaintiffs

---

[1] Plaintiffs' appraiser reports 4,405 square feet of gross finished living area while Defendant's appraiser reports 4,385 square feet, a difference of 20 square feet.  (Ptfs' Ex 1 at 3; Def's Ex A at 5.)  The court has rounded the home's size to 4,400 square feet.

amended their value request at trial to $629,000, which, comes to $143 per square foot, rounded

($629,000 ÷ 4,400 square feet). Defendant requests that the court sustain the board's value of

$836,950 ($190 per square foot, rounded). (Def's Answer at 1; Def's Ex J at 1.)

C.      *Plaintiffs' Evidence*

Plaintiffs submitted an appraisal report prepared by Broughton that estimated the real

market value of the subject property at $629,000 as of January 1, 2014. (Ptfs' Ex 1 at 2.)

Broughton's value estimate was based solely on the sales comparison approach. (*Id*. at 5.)

Broughton testified that he selected his comparable sales based primarily on age (chronological

and effective), size, room count, and location. The appraiser used five homes that sold in the

same neighborhood as the subject property that are all within approximately one-quarter mile of

the subject property. (*Id*. at 3, 10.) The comparables sold between May 2013 and June 2014.

(*Id*.) The unadjusted sale prices of the five comparables ranged from a low of a $510,000 (sales

3 and 5) to a high of $750,000 (sale 1). (*Id*.) The other two comparables sold for $550,000 (sale

2) and $615,000 (sale 4). (*Id*.)

The parties' evidence conflicts with regard to the physical characteristics of Plaintiffs'

comparable sales. The discrepancies were not resolved at trial. For purposes of this decision the

court will accept Plaintiffs' appraiser Broughton's descriptions of his comparable sales.

Plaintiffs' sale 1 was larger than the subject property (4,820 square feet versus 4,400 for the

subject property) while sales 2 through 5 were smaller in size at 3,318 square feet (sale 2), 2,766

square feet (sale 3), 3,775 square feet (sale 4) and 3,044 square feet (sale 5). (*Id*.) Looking at

age, Plaintiffs' comparables were built in 1998 (sale 1), 1999 (sale 2), 1997 (sale 3), and 1996

(sales 4 and 5). (*Id*.) Four of Broughton's five sales were similar in terms of room count and

number of bedrooms and bathrooms, with the exception being sale 3. Sale 3 had only eight

rooms compared to the subject property's 10 rooms, and three bedrooms and two full bathrooms plus a half bath compared to Plaintiffs' home, which has four bedrooms and four bathrooms. (*Id.*) Four of Broughton's five sales had very similar lot sizes, with sale 2 being the exception; that home was situated on a 0.49-acre lot compared to the subject property's 0.3-acre lot. (*Id.*) Finally, the subject property is a class of 7-minus while Plaintiffs' comparables are a class 6-plus, 5-plus, 5, 6, and 5-plus, respectively for sales 1 through 5. (Def's Rebuttal Exs B at 1, C at 1, D at 1, E at 1 and F at 1.)

Plaintiffs' appraiser made adjustments for view, lot size, age and condition, room count, gross living area, and certain outdoor amenities (porch, patio, deck, and fencing). (Ptfs' Ex 1 at 3, 10.) The appraiser's total gross adjustments to his five sales were as follows: $137,950 (18 percent) for sale 1, $114,110 (21 percent) for sale 2, $107,670 (21 percent) for sale 3, $24,900 (4 percent) for sale 4, and $100,330 (20 percent) for sale 5. (*Id.*) Net adjustments were generally much smaller, with the exception of sales 3 and 5. Those adjustments were negative $37,950 (5 percent) for sale 1, $54,110 (10 percent) for sale 2, $93,670 (18 percent) for sale 3, $14,900 (2 percent) for sale 4, and $84,330 (17 percent) for sale 5. (*Id.*) The adjusted sale prices of the five comparables (using net adjustments) were $712,050 (sale 1), $604,110 (sale 2), $603,670 (sale 3), $629,900 (sale 4), and $594,330 (sale 5). (*Id.*)

All of the comparable sales except sale 4 had a $50,000 positive adjustment for lack of a river view. (*Id.*) Other significant adjustments were for differences in age (negative $34,000 to sale 1 and negative $20,000 to sale 2), gross living area ($32,610 to sale 2, $49,170 to sale 3, and $40,830 to sale 5), and exterior amenities (*e.g.*, sale 1 had a negative $35,000 adjustment because it had an in-ground pool and large fountain which the subject property lacks). (*Id.*) The appraiser's report states that "[c]redence is placed on all five sales." (*Id.* at 9.) At trial

Broughton testified that sale 4 was his best comparable because it had the fewest adjustments, was about the same age as the subject property, was on the pathway/river like the subject property, and very close in proximity to the subject property (0.04 miles). (Ptfs' Ex 1 at 10.) Broughton testified that he gave sale 4 the most weight. His adjusted sale price for that property was $629,900. (*Id.*)

Eduard Weber, one of the owners of the subject property, and who resides in the home, testified at trial that the subject property needs new exterior paint and a new roof. Weber testified that a professional painter who painted his neighbor's house told him that his home needs painting and that it would cost between $5,000 and $6,000 to have the home painted. Weber testified that he did not get a bid for the exterior painting because he did not have the money "at this time" to paint the home.

Turning to the roof, Weber testified that he recently had the roof cleaned and the gentleman who cleaned his roof told him that there were several broken tiles, and that the roof was not in good condition and may need to be replaced. Weber testified that the roof has leaked in the past and that he used buckets to catch the water while it was raining and that "sometimes" he patched the roof himself from the inside (the attic) after the rain stopped. Weber testified that he used roofing cement to patch the roof, but that those repairs were "band aids"; that what the home really needed was a new roof. There was no testimony of anyone other than Weber repairing the roof. Weber got a bid for a new roof, and the estimate for replacing the current tile roof with a new one was $69,836, plus $2,840 for new gutters. (Ptfs' Rebuttal Ex 1 at 2.) Plaintiffs' appraiser Broughton testified that he was unaware that the home needed a new roof but that if it did, the approximately $70,000 cost would need to be subtracted from his $629,000 value estimate for the subject property. However, Broughton also testified that if the subject

property needed a new roof, the effective age of the home, as reported in his appraisal, would need to be changed from 15 years to 20 years (to reflect the poorer condition of the roof), a change that would affect the age adjustments Broughton made to his comparable sales. Broughton did not elaborate further or run through the exercise of making whatever adjustments would be necessary to reflect the condition of the roof as reported by Weber.

Plaintiffs submitted a rebuttal exhibit that included excerpts from a well-known property appraisal treatise—Appraisal Institute, *The Appraisal of Real Estate* 309–311 (13th ed 2008). When questioned by Plaintiffs' representative, Broughton agreed with several excerpts from that treatise, including the fact that "basic elements of comparison that should be considered in sales comparison analysis are * * * 6. [l]ocation [and] 7. [p]hysical characteristics (*e.g.*, size, soils, access, construction quality, condition)." (Ptfs' Rebuttal Ex 2 at 2.) On cross examination, Bowlsby asked Broughton whether he made an adjustment for construction quality. Bowlsby was referring to property classification, noting that the subject property was a class 7-minus, and that Broughton's comparables were classified for property tax purposes as a 6-plus (sale 1), 5-plus (sale 2), 5 (sale 3), 6 (sale 4), and 5-plus (sale 5). (Def's Rebuttal Exs B at 1, C at 1, D at 1, E at 1, and F at 1.) Broughton testified that he did not make any specific adjustment for quality of construction. Broughton testified that quality of construction is included in other adjustments; that in selecting his comparable sales he focuses on location, size, and age, and that quality of construction would be "inherent" or "baked in" there. Broughton further testified that a Fannie Mae appraisal form has a row for construction quality but that the form he used for appraising the subject property lacked such a row. Broughton acknowledged that homes in the neighborhood of the subject property ranged in "class" from a 5 up to a 7-minus. Broughton

/ / /

then testified that class does not indicate any difference in quality of construction that would make a difference "on this type of appraisal."

D.    *Defendant's Evidence*

Defendant's evidence includes sales history information for the subject property and sales information on three homes located in the same neighborhood and within several blocks of the subject property, including one next door to the subject property. (*See* Def's Ex J at 10, 14, 16, 26, 27, 31, 35.)

The subject property was sold in 1996 for $795,000. (*Id*. at 10.) The property was then sold by a lending institution at a public auction in November 2002 for $642,000 after the owners defaulted on their loan obligation. (*Id*. at 14–15.) Eduard and Marie Weber (Plaintiffs) purchased the home in April 2003 from a different lending institution for $678,000. (*Id*. at 16.) Plaintiffs live in the home, title to which is held by Eduard Weber and Marie A. Weber, Trustees of the Eduard Weber and Marie A. Weber Revocable Trust, pursuant to a transfer of title to the property in February 2014. (Ptfs' Ex 1 at 27.)

Defendant's three comparable homes sold in October 2013 (sale 1), April 2013 (sale 2), and May 2014 (sale 3), for $985,000, $970,000, and $900,000, respectively. (Def's Ex J at 27, 31, 35.) On a per-square-foot basis, those homes sold for $184 per square foot (sale 1), $229 per square foot (sale 2), and $232 per square foot. (*Id*.) Defendant's appraiser Bowlsby adjusted the sale price of her comparable sale 3 to $875,000 for closing costs, which reduced the price per square foot to $225. (*Id*. at 35.)

Defendant's sale 1, located next door to the subject property, was a class 6-plus home built in 2004 that had four bedrooms, four full bathrooms and two half baths, and a total finished living area of 5,359 square feet. (*Id*. at 27.) Sale 2 was a class 6-plus home built in 2000 that

had two bedrooms, three full bathrooms and one half bath, a total finished living area of 4,231 square feet and an oversized (1,192 square feet) attached garage. (*Id*. at 31.) Sale 3 was a class 6-minus home built in 1998 that had three bedrooms, three full bathrooms and one half bath, a total finished living area of 3,884 square feet and an oversized (1,220 square feet) attached garage. (*Id*. at 35.) All three homes had cement tile roofs, like the subject property, and were built on lots similar in size to the subject property. (*Id*. at 27, 31, and 35.)

Defendant's appraiser did not make any adjustments for differences between her comparable sales and the subject property other than the adjustment to the sale price of sale 3 for conditions of sale, but she testified on cross examination that her sales show a range in value that supports the board's value. On rebuttal, Broughton testified that he did not use any of Bowlsby's sales because all of those properties are newer than the subject property. Broughton briefly testified to several differences between Bowlsby's sales and the subject property, but he reiterated that the main reason he did not use any of Bowlsby's sales in his appraisal was because they are "younger." When later questioned by Bowlsby, Broughton did acknowledge that all five of his comparable sales are younger than the subject property in chronological age and two (sales 1 and 2) are also younger in effective age. Those home were built in 1998 and 1999 (chronological age), and had an effective age of 10 years (i.e., 2004). (Ptfs' Ex 1 at 3.) The subject property was built in 1994 (20 years chronological age) and Broughton determined it had an effective age of 15 years (*i.e.*, 1999). (*Id*.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2014-15 tax year.

/ / /

A.      *Real Market Value and Burden of Proof*

ORS 308.205(1) defines real market value:[2]

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; ORS 308.210(1).

Because Plaintiffs are the party seeking affirmative relief, they have the burden of proof and must establish by a "preponderance" of the evidence that there is an error in the real market value appearing on the assessment and tax rolls. ORS 305.427; *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves*, 4 OTR at 312. "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

To sustain the burden of proof, a taxpayer must "provide competent evidence of the [real market value] of [the subject] property." *Poddar v. Dept of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D at 7, WL 879285 (Mar 13, 2012).

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Here both parties relied on the sales comparison approach. Plaintiffs presented evidence on five sales in close proximity to the subject property and made adjustments for certain differences between those sales and the subject property. (Ptfs' Ex 1.) Defendant presented evidence on the sales history of the subject property and sales of three homes located close to the subject property, but made no adjustments for differences between those comparable sales and Plaintiffs' property. (Def's Ex J.)

The sales comparison approach is often the most relevant for valuing residential properties. *Monserud v. Clatsop County Assessor*, TC-MD 100577C, WL 2222187 at *3 (June 6, 2011). Under that approach, "[t]he court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at * 3 (Mar 26, 2003). Oregon Administrative Rule (OAR) 150-308.205-(A)(2)(c) provides, in part:

> "In utilizing the sales comparison approach only actual market transactions of property *comparable to the subject, or adjusted to be comparable*, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

(Emphasis added.)

B. *Plaintiffs' Evidence*

1. *Plaintiffs' Appraisal*

As stated above, ORS 305.427 places the burden of proof on Plaintiffs. The court has several concerns with Plaintiffs' appraisal. To begin with, Broughton made large adjustments to four of his five sales, comparable sale 4 being the exception. For example, sales 1, 2, 3 and 5

have $50,000 location adjustments because they are not on the river. (Ptfs' Ex 1 at 3, 10.) Sales 2 and 3 have age adjustments of negative $34,000 and negative $20,000. (*Id*. at 3.) Sales 2, 3 and 5 have positive adjustments of $32,610, $49,170, and $40,830 respectively for difference in size, and sale 1 has a $35,000 amenities adjustment because of an in-ground pool and fountain. (*Id*. at 3, 10.) Broughton's gross adjustments to four of his five comparables exceed $100,000 for homes that sold for $750,000 (sale 1), $550,000 (sale 2) and $510,000 (sales 3 and 5). On a percentage basis, those adjustments totaled 18 percent (sale 1), 21 percent (sales 2 and 3), and 20 percent (sale 5). (Ptfs' Ex 1 at 3, 10.) Admittedly, net adjustments are considerably smaller for three of the five comparables. (*Id*.) Nonetheless, the use of sales requiring such large adjustments calls into question the comparability of four of Broughton's five sales. Those adjustments suggest to the court that four of Plaintiffs' five sales (sales 1, 2, 3 and 5) are not truly comparable. *See Schmidt v. Clackamas County Assessor*, TC-MD 140134C, WL 782990 at *7 (2015) (concluding that sales used by taxpayers' appraiser in sales comparison approach were not comparable because of the magnitude of the adjustments).

Furthermore, three of Broughton's sales are considerably smaller than the subject property (sale 2 at 3,318 square feet, sale 3 at 2,766 square feet, and sale 5 at 3,044 square feet compared to the subject property at 4,400 square feet); two (sale 3 and sale 5) are so much smaller than the subject property that they raise serious concerns about comparability. (Ptf's Ex 1 at 3, 10.) Moreover, Defendant's three sales of homes similar to the subject property at considerably higher prices ($985,000, $970,000, and $900,000) strengthen the court's concerns with Plaintiffs' choice of comparables that sold for between $510,000 and $750,000, with three selling for less than $600,000.

/ / /

Another concern the court has with Broughton's appraisal is that he did not give any explanation of how he decided what adjustments to make or how he calculated his adjustments, either in his written appraisal or at trial. Such testimony might have allayed the court's concerns with the size of Broughton's adjustments. "Unexplained adjustments compromise the validity of the market approach which is based on the 'adjusted' sale price of comparable properties." *Donovan v. Jackson County Assessor*, TC-MD 020136D, WL 31108194 at *4 (Sept 20, 2002); *see also Murray v. Wasco County Assessor*, TC-MD 150207N, WL 6786429 at *8 (Nov 6, 2015) (expressing concern over appraiser's lack of explanation for certain adjustments made to comparable sales).

Additionally, the court cannot understand Broughton's age adjustments to sales 1 and 2. Both homes were newer than the subject property, in terms of both actual and effective age. (Ptfs' Ex 1 at 3.) Broughton adjusted sale 1 by either $8,500 per year or $6,800 per year, depending on whether the yardstick was actual or effective age. (*Id*.) Yet Broughton adjusted sale 2 by $4,000 per year for difference in age, both actual and effective. (*Id*.) As indicated above, the amount of the adjustments were negative $34,000 and negative $20,000, respectively. Testimony on that point would have been helpful, or at least insightful, for the court.

Finally, the court has concerns with Broughton's selection of comparable sales compared to his stated criteria for choosing comparables. Broughton testified that the main criteria he used in selecting his comparable sales are age, size, location, and room count. He made that statement both on direct and cross examination. Yet, his comparables do not conform well to his stated criteria, except for age. The subject property is 4,400 square feet and only one comparable is very similar in size (sale 1 is 4,820 square feet). The other four sales are smaller than the subject property, and three are considerably smaller (sale 2 at 3,318 square feet, sale 3 at 2,766 square

feet, and sale 5 at 3,044 square feet). (Ptfs' Ex 1 at 3, 10.) Two of the five have a lesser room count (sales 2 and 3), and four of the five were adjusted by $50,000 for difference in location (lack of a river view). (*Id*.) And, even though Broughton's sales were relatively similar in terms of age, the appraiser still made rather large adjustments to two of his five sales for differences in age (negative $34,000 and negative $20,000 respectively for sales 1 and 2.) (*Id*. at 3.)

2. *Plaintiffs' Evidence Regarding the Condition of the Roof and Exterior Paint*

Weber testified that the subject property needs exterior paint and a new roof. Weber's testimony about the paint is speculative and based on hearsay. Weber simply asserted that the home needs to be painted and that a painter who painted the neighbor's house told him that his house needs paint and that it would cost between $5,000 and $6,000. The painter did not testify and Weber's testimony about the painter's remarks is therefore hearsay. Weber did not elaborate on why he believed the home needed to be painted. There is no other reliable evidence to support Weber's testimony that the home needs to be painted. And, Plaintiffs' appraiser did not address it in his report or at trial. Moreover, there are no written bids or estimates for the cost to paint the house. Accordingly, the court puts no weight on the testimony about the need for new exterior paint.

Plaintiffs' evidence about the roof is somewhat stronger, but still not without its shortcomings. Weber testified that he had his roof cleaned and that the person that cleaned his roof told him there were several broken tiles and that the roof *may* need to be replaced. The roof cleaner did not testify, and Weber's testimony about the roof cleaner's remarks is rejected as hearsay. Moreover, that testimony, if accepted, merely establishes that an individual who cleaned Plaintiffs' roof opined that it may need to be replaced, not that it did need replacement, and there is no evidence that the roof cleaner was qualified to render an opinion as to the

condition of the roof. There is Weber's uncontroverted testimony about some problems with leaks in his roof that he has dealt with by using buckets to catch the water until the rain stops. Weber testified that after the rain stopped he "sometimes" patched the roof by going up into the attic and applying roofing cement to the leaky areas. That testimony is considerably more detailed than Weber's testimony regarding the paint. However, Weber did not testify as to when the problem began, or how serious it is in terms of the scope or severity of the problem, leaving it unclear whether the roof needs to be replaced, or merely repaired. Weber submitted a proposal dated October 27, 2015, that offered several solutions for replacing the roof. (Ptfs' Rebuttal Ex 1.) That document does not include any discussion or analysis of the problem. It is simply a cost estimate for a new roof. Three options were given: a three-tab shingle roof installed for $32,000, a metal panel roof system installed for $51,200, and a new tile roof installed for $69,836. (*Id*. at 1–2.) The court accepts that Plaintiffs' home has a roof that has leaked. But the evidence does not satisfactorily establish that the home needs a new roof as opposed to a repair of the existing roof, or that the roof leaked on the assessment date of January 1, 2014. Because of these shortcomings, the court places no weight on the evidence regarding the alleged need for a new roof.

3. *Court's Evaluation of Plaintiffs' Evidence*

Plaintiffs' counsel argued that under *Publishers Paper Co. v. Dept. of Rev.*, 270 Or 737, 744–745, 530 P2d 88 (1974), once the taxpayer introduces substantial evidence of a likely error in value, the burden shifts to the assessor; the taxpayer need only show a reduction in value is appropriate. It is not clear to the court whether Plaintiffs' counsel was referring to the burden of production or burden of persuasion, or what effect such a shifting would have on the outcome of the case.

The court in *Publishers Paper* quoted ORS 305.427, the statute that sets forth the burden of proof in the tax court. That statute reads:

> "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief and the burden of going forward with the evidence shall shift as in other civil litigation."

ORS 305.427. The court explained the practical application of ORS 305.427 as follows:

> "As in ordinary civil litigation, when the party bearing the burden of proof introduces sufficient evidence to make out a prima facie showing on a particular phase of his case, the burden of going forward shifts to his opponent.
>
> "We take this to mean in practical terms that the [assessor] initially need show nothing to justify its assessment or the method by which it was derived. However, once the taxpayer has introduced substantial evidence tending to show a value of the property different from that asserted by the assessor, the burden of going forward shifts to the [assessor] to refute this showing * * *."

*Publishers Paper*, 270 Or at 744–745.

Five years later, in an en banc opinion, the Oregon Supreme Court again addressed the tax court's statutory burden of proof and, citing *Publishers Paper*, stated, "the plaintiff has the initial burden in the tax court of producing evidence which, if unrebutted, would establish a valuation different from that found by the [assessor.]" *Borden, Inc. v. Dept. of Rev.*, 286 Or 567, 576, 595 P2d 1372 (1979).

However, in *Nelson v. Hughes*, 290 Or 653, 625 P2d 643 (1981), a suit to quiet title decided after *Publishers Paper* and *Borden*, the Oregon Supreme Court questioned whether the burden of going forward ever shifts. There the court stated in a footnote:

> "Notwithstanding repeated references in earlier decisions of this court that the burden of going forward shifts under various circumstances, we are not sure that is, strictly speaking, true, and we suspect that such statements lead to confusion. When the party having the burden of proof submits sufficient evidence to support a recovery on a claim or a defense asserted by that party, it is said that the party has established a prima facie case or defense.

"However, unless the evidence is so strong that but one conclusion can be drawn from the evidence, the trier of fact is free to hold for or against the party who created the prima facie case. But there is no shifting of the burden of going forward."

*Nelson*, 290 Or at 666-667 n 17.

Discussions about the shifting of burdens can be confusing, and in the context of property valuation appeals, largely an academic exercise with no practical effect on how the court ultimately evaluates the evidence to determine if a change in value is warranted. This is true for a number of reasons. One reason is that often, as in this case, only one party is seeking relief—Plaintiffs. Under the statute, Plaintiffs therefore have the burden of proof and must establish an error in the value of the subject property by a preponderance of the evidence. ORS 305.427. Thus, regardless of whether there is a shifting of the burden, Plaintiffs must ultimately persuade the court by the requisite degree of conviction that a reduction in value is warranted.

Another problem with Plaintiffs' assertion that there is a shift in the burden is that that contention is unclear because there are two aspects to the "burden of proof"; one is the burden of production the other the burden of persuasion.[3] *See* Laird C. Kirkpatrick, *Oregon Evidence* §§ 305.03, 307.03 (6th ed 2013). In discussing OEC 307, which addresses the burden of production, Kirkpatrick states that "Rule 307 clearly distinguishes the burden of producing evidence from the burden of persuasion covered by Rule 305."[4] Kirkpatrick, *Oregon Evidence* § 307.03 at 117. And in discussing OEC 305, which pertains to the burden of persuasion, Kirkpatrick notes that "[b]ecause it has two

---

[3] The "burden of production" is synonymous with the "burden of going forward with [the] evidence." *Black's Law Dictionary* 209 (8th ed 2004).

[4] The Oregon Evidence Code (OEC) does not apply to the Magistrate Division. ORS 40.015(1)(a); ORS 305.501(4)(a). Nevertheless, OEC 305 and 307 are relevant here because they describe the "burden of proof" and burden shifting "in other civil litigation." *See* ORS 305.427.

distinct meanings, 'burden of proof' is a frequently confused concept. It may refer to the party's burden of producing evidence, or it may refer to a party's obligation to persuade the trier of fact regarding the existence or nonexistence of a fact." Kirkpatrick, *Oregon Evidence* § 305.03[1] at 108. Plaintiffs' counsel in this case was presumably referring to a shifting of the burden of production when he asserted that "the burden shifts" to the assessor once Plaintiffs introduce substantial evidence of a likely error in value. At least, that seems to be the logical conclusion based on the wording of counsel's claim and his reliance on *Publishers Paper*.

Assuming for the sake of argument that there is a shifting of the burden of production as Plaintiffs assert, notwithstanding the doubts expressed by the Supreme Court in *Nelson*, the taxpayer has the initial burden of introducing enough evidence to establish, if unrebutted, a value different than that currently on the assessment and tax rolls. *Borden*, 286 Or at 576. Under *Publishers Paper*, the taxpayer must introduce "substantial evidence tending to show a value * * * different from that asserted by the assessor" in order for the burden to shift to Defendant to refute such a showing. 270 Or at 745. In this case, the question of whether Plaintiff successfully shifted the burden of production to Defendant is academic because Defendant *did* produce evidence attacking Plaintiffs' position. And in any event, the burden of persuasion remains on Plaintiffs—they must persuade the court by a preponderance of the evidence that a reduction in value is warranted. The court concludes that Plaintiffs have not carried that burden.

As explained above, four of Plaintiffs' five comparable sales have rather large adjustments. Plaintiffs' appraiser offered no explanation as to how he arrived at his adjustments. The court has found that those four comparables do not appear to be truly comparable, both for the reasons stated immediately above and because Plaintiffs' appraiser failed to include any of

Defendant's three sales, all of which appear similar to the subject and sold for amounts much greater than Plaintiffs' sales. Broughton's five unadjusted sales changed hands for approximately $150,000 to $475,000 less than Bowlsby's three unadjusted sales. All eight of the sales presented by the appraisers are within blocks of the subject property, seven of the eight are similar in age and amenities (Defendant's sale 1 was built in 2004, ten years after the subject property), and all sold within a reasonably close proximity to the applicable assessment date. The disparity is troubling, and Plaintiffs' appraiser's rationale for not including any of Defendant's comparables—a difference in age—is unpersuasive. That concern is addressed by the court further down in this decision. Additionally, the court analyzed Plaintiffs' adjustments and found inexplicable problems with the appraiser's age adjustments. Finally, the sales selected by Plaintiffs' appraiser do not match his stated criteria for selection of comparables. Those shortcomings are fatal to Plaintiffs' case. Plaintiffs' evidence was insufficient to persuade the court by a preponderance of the evidence that a reduction in value is warranted.

B.      *Defendant's Evidence*

Even though Plaintiffs failed to meet the requisite burden of proof, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412; *Yamhill House LLC v. Multnomah County Assessor*, TC-MD 140156D WL 2398266 at *5 (May 18, 2015). And although Defendant has not asked the court to increase the property's real market value, Defendant did present evidence of sales above the current roll value, as discussed below. Therefore, the court will examine Defendant's evidence of value, beginning with Defendant's presentation of the subject property's sale history.

/ / /

1.      *Defendant's Sales History Data for the Subject Property*

Defendant's appraiser Bowlsby introduced evidence regarding prior sales of the subject property. The home sold for $795,000 in 1996; then in November 2002 it sold at auction for $642,000. (Def's Ex J at 10, 14–15.) Plaintiffs then purchased the property in April 2003 from a lending institution for $678,000. (*Id*. at 16.) Those sales are too dated to be of any evidentiary value to the court.

2.      *Defendant's Comparable Sales*

Defendant's appraiser Bowlsby introduced evidence of three sales of homes located in close proximity to the subject property (within two blocks of Plaintiffs' home) that sold between April 2013 and May 2014. (Def's Ex J at 27, 31, and 35.) The sales are similar in size and have the same or fewer number of bedrooms and bathrooms as the subject property. (*Id*.) And, they are all similar in class to the subject property and situated on lots similar in size to the subject property. (*Id*.) The homes sold for $985,000, $970,000, and $900,000. (*Id*.) However, Bowlsby made no adjustments to her comparable sales, except one minor adjustment to her sale three for closing costs. Contrary to her testimony, that evidence does not constitute an appraisal. Moreover, Bowlsby did not present the court with an estimate of value, but rather testified that her sales supported the current roll value.

This court has previously ruled that because sales are seldom comparable in every detail, adjustments must be considered which reflect differences. *J. R. Widmer, Inc. v. Department of Revevenue*, 4 OTR 361, 369 (1971), *aff'd* 261 Or 371, 494 P2d 854 (1972). "In evaluating the competing evidence, the court looks to the comparability of the different sales and the application of all necessary adjustments for differences. Adjustments are a key component in

/ / /

evaluating properties." *Voronaeff v. Crook County Assessor*, TC-MD No 110361C, WL

1426847 at *3 (April 25, 2012). According to The Appraisal of Real Estate:

> "Ideally, if all comparable properties are identical to the subject property, no
> adjustments will be required. However, this is rarely the case * * *. After
> researching and verifying transactional data and selecting the appropriate unit of
> comparison, the appraiser adjusts for any differences."

Appraisal Institute, *The Appraisal of Real Estate* 307 (13th ed 2008.)

The lack of adjustments or a stated estimate of value presents a problem for Defendant.

However, Plaintiffs' evidence is also lacking in persuasiveness as explained above. The court

also finds it troubling that Plaintiffs' appraiser, Broughton, chose not to use any of Bowlsby's

three sales, explaining that his main reason for rejecting those sales was because they were

"younger." Broughton's sale 1 was a home built in 1998 and the home in his sale 2 was built in

1999. (Ptfs' Ex 1 at 3.) Bowlsby's sale 2 was built in 2000 and her sale 3 was built in 1998.

(Def's Ex J at 31, 35.) The court does not find age to be a sufficient reason for Plaintiffs'

appraiser to have rejected Bowlsby's sales 2 and 3. That is not to say that those sales provide the

court with an indication of value for the subject property. They do, however, add to the concerns

the court has with Plaintiffs' appraisal. It is not lost on the court that Plaintiffs' comparables sold

for between $510,000 and $750,000, while Defendant's comparables sold for between $900,000

and $985,000.

The court finds that there is insufficient evidence to change the real market value

currently on the assessment and tax rolls. Plaintiffs have failed to establish by a preponderance

of the evidence that the real market value of the subject property should be reduced to $629,000.

Defendant's evidence is also insufficient to establish a specified value different from that

currently on the assessment and tax rolls. And although ORS 305.412 gives "the court * * *

jurisdiction to determine the real market value or correct valuation [of a property] on the basis of

the evidence before the court, without regard to the values pleaded by the parties[,]" the evidence, taken as a whole, does not establish a value different from the current roll value.

## III. CONCLUSION

After carefully evaluating and weighing the evidence, the court concludes that Plaintiffs have failed to establish by a preponderance of the evidence that there is an error in the real market value of the subject property, identified as Account 1521903, for the 2014-15 tax year. The current real market value of $836,950 is therefore sustained. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal for a reduction in the real market value for the 2014-15 tax year is denied and the values on the assessment and tax rolls are sustained.

Dated this ____ day of January 2016.

DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on January 27, 2016.*