IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DAVID EMAMI and )
DIANA EMAMI, )
                                               )
         Plaintiffs,                           )   TC-MD 190061R
                                               )
     v.                                        )
                                               )
LINCOLN COUNTY ASSESSOR,                       )
                                               )
         Defendant.                            )   **DECISION**

Plaintiffs appeal Defendant's Board of Property Tax Appeals Order, mailed February 19, 2019, for the 2018-19 tax year. Plaintiffs also appeal the property tax assessments for the 2016-17 and 2017-18 tax years pursuant to ORS 305.288.[1] A trial was held on August 15, 2019, in the courtroom of the Oregon Tax Court. William S. Phinney appeared on behalf of Plaintiffs. Gabby Massaad (Massaad), Stewart Strauss (Strauss), Diana Emami (Emami), and Paul Jackson (Jackson) testified on behalf of Plaintiffs. Caleb Stokes (Stokes) appeared on behalf of Defendant. Stokes and C.J. Hurtt (Hurtt) testified on behalf of Defendant. Plaintiffs' Exhibits 1, 2, 4 and 5 were received without objection. Defendant's Exhibits A, B and C were received without objection.

I. STATEMENT OF FACTS

The subject property is a 1.43-acre lot, containing a 3,818 square foot single family residence with 4 bedrooms and 3.5 baths built in 1993, in Lincoln County, Oregon. Located in a gated community this beach-front property overlooks a bay with half an acre west of the vegetation line.

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2017,

The subject property was listed for sale in 1999 for $1,200,000 and remained on the market for several years. In 2001, Western Architectural Waterproof Consultants (Western Architectural) examined the residence and wrote two reports finding the stucco was defective with excess moisture behind the cladding causing significant water damage. As a result of the siding and water damage, Plaintiffs were able to purchase the subject property for the discounted amount of $515,000, with the provision they would assist the seller by testifying in a lawsuit against the builder. Emami testified that Plaintiffs purchased the subject property with the intent to demolish the house and rebuild. Plaintiffs did not demolish the house as planned but instead frequently repainted the house with a special waterproof paint to prevent further water damage. Emami testified that the stucco and part of cladding was removed and replaced with Hardie Plank lap siding in the summer of 2018.

Jackson testified that he has been a general certified real estate appraiser in Oregon and Washington for 28 years. He inspected the subject property on behalf of Plaintiffs, talked to realtors in the area, and reviewed reports regarding the construction defects and water damage from architect Steward Gordon Strauss, the Massaad Engineering Group, JDR Builders, and Western Architectural. In early 2019, Jackson performed a retrospective market analysis of a fee simple interest in the subject property as of January 1, 2018, using the hypothetical assumption that the property was free from major defects. He determined the highest and best use of the property was as a single-family dwelling. Jackson did not analyze the cost approach because he considered it inappropriate for an older single-family dwelling. Jackson also did not analyze the income approach due to significant legal restrictions on commercial use of the property.

Jackson considered six comparable sales in the area surrounding the subject property. Jackson verified each sale with a broker involved in the transaction and adjusted for the date of

sale, number of bedrooms and bathrooms, grossing living area, land size, and number of garage bays. (Ex 1 at 40.) Jackson concluded that the value of the subject property, assuming a hypothetical "good condition," as of January 1, 2018, was between $916,000 and $1,071,000. Jackson settled on a hypothetical retrospective value of $975,000.

Jackson testified and included in his appraisal a "functional obsolesce analysis" which he asserts, proves the value of the dwelling is zero. The appraisal report states that based on the reports Jackson has reviewed "the subject has significant dry rot damage to many of the structural beams within the building that became damaged due to poor construction and faulty materials." (Ex 1 at 47.) The report states: "Currently the building is not financeable as it would never pass a building dry-rot inspection. This property cannot be remodeled or altered in any way without making significant repairs to the dry-rotten structure." *Id*. The report also notes that a "sister" property, adjacent to the subject property, was built by the same contractor using the same design, was listed for sale at $1,300,000 but sold for $775,000 in August 2014 due to "moisture and structural issues." *Id*. The report further states according to the real estate agent involved in the sale, rather than repair damage, the owners of the sister property decided to tear it down and start over. Jackson testified that he spoke with several real estate brokers that told him there was a negative "stigma" attached to the subject property due its historical condition. The report asserts that for purposes of the analysis the cost to cure is based on a construction bid by JDR Builders in the amount of $477,477. Jackson testified that he did not contact JDR Builders but took their numbers at face value. Jackson added in his report that "considering the nature or the damage, it is reasonable to add a 25% contingency for cost overrun to this bid….[rounding the cost] to $600,000." *Id*. Using that figure, Jackson subtracted his cost to cure from the hypothetical retrospective value resulting in an indicated value of $375,000.

Value based upon Jackson's report:

$$\underset{\substack{\text{Hypothetical} \\ \text{Retrospective} \\ \text{Value}}}{\$975{,}000} \quad - \quad \underset{\substack{\text{Rounded JDR Builders'} \\ \text{cost to cure bid} \\ (\$477{,}477), \text{ plus } 25\% \\ \text{overrun contingency}}}{\$600{,}000} \quad = \quad \underset{\text{Resulting Land Value}}{\$375{,}000}$$

Jackson notes that Defendant's roll has the land value at $350,000, and that there would exist some site improvements, and thus his final real market value of the subject property as of January 1, 2018 is $366,750. The report states that "the opinions of value reported herein are contingent upon extraordinary assumptions and/or hypothetical conditions ('EA/HC'). EA/HC not met could have a negative impact on the value conclusions and could invalidate the entire appraisal." (Ex. 1 at 48.)

Massaad testified he has been a structural engineer for 22 years. Massaad drove by the house and reviewed the reports from Western Architectural dated in 2001. (See Ex. 1 at 84-111.) He was asked to provide a review of structural work but did not produce a formal report because he would need to do a more thorough investigation of the structure than can be seen in the photographs provided. (*Id.* at 88-97, 100-111) He testified that the pictures of the house were sufficient to show the siding had failed and dry rot was present. He observed that the stucco used on the dwelling is a generally poor choice in Oregon, but is particularly bad on the coast, because of water intrusion. Massaad opined that the house is not structurally sound because there are too many windows on the side facing the ocean. He also indicated the foundation needs investigation because if it is on a slab, it might need upgrading, but added, only a G-Tech engineer could determine that.

Struss testified he has been a licensed architect since 1975. Struss visited the house and

reviewed a number of photographs showing water intrusion. He noted two sections where the flat roof was a particular problem for water damage. The damage was on the surface, but Struss noted that his real concern was the underlying structure, that would have to be opened up to see the problems. Struss noted that the siding should be removed, and a new moisture barrier installed, however, he noted that it might make the most sense to tear down the house and rebuild because it might be less costly.

Emami testified that when Plaintiffs purchased the subject property in September 2001 they were aware of the conditions of the house and had reviewed the Western Architectural reports. She testified that they intended to demolish the house and build a new home. In the meantime, Plaintiffs applied elastomeric paint to prevent further deterioration of the siding. Emami noted that the house next door, which was a mirror image of her house and built around the same time, was purchased and torn town. She testified that other than having the siding replaced in the summer of 2018, Plaintiffs have not made substantial changes to the home since their purchase.

Stokes testified that he has been an appraiser for Defendant for one year. He inspected the subject property on November 27, 2018 and took photographs. Emami told him about water issues the house was facing, about degradation of the window and door headers resulting in cracks and fissures including separation of the chimney from the wall. During his inspection, Stokes was unable to find any cracks or evidence of water damage. Emami told Stokes about problems with the stucco, but by the time he inspected the house it had already been removed replaced by new Hardie Plank siding. Stokes testified that Plaintiffs never gave him proof of the repairs or receipts for the work performed.

Stokes prepared an appraisal report selecting four comparable sales in the immediate area

around the subject property. Stokes adjusted the sales for time at the rate of 1 percent per month based on a report of recent paired sales in the county. Stokes also adjusted for the size of the site, the gross living area, and garage capacity. The report determined the value of the subject property was $850,000, as of January 1, 2016; $878,000, as of January 1, 2017; and $930,680, as of January 1, 2018. (Ex. A at 4.)

Values per year based on Stokes report:

| Tax Year | Land | Improvements | Total |
| --- | --- | --- | --- |
| 2016-2017 | $370,000 | $480,000 | $850,000 |
| 2017-2018 | $369,000 | $508,800 | $878,800 |
| 2018-2019 | $391,352 | $539,328 | $930,680 |

Hurtt testified that he has been a residential appraiser for Defendant for five years, after previously being a building inspector in Nevada. Hurtt testified that he accompanied Stokes to the subject property in 2018 and could not detect any sign of drywall cracking, settling, discoloration of the interior walls, or the smell of mold. Additionally, he did not observe any issues with the recently installed siding.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2016-17, 2017-18 and 2018-19 tax years. ORS 308.205(1)[2] defines real market value as:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arms-length transaction occurring as of the assessment date for the tax year."

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

The assessment dates are January 1, 2016, January 1, 2017, and January 1, 2018 respectively. ORS 308.007; ORS 308.210(1). Three approaches to value must be considered: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a). Although all three approaches must be considered, all three may not be applicable in a given case. *Id.* The sales comparison approach "may be used to value improved property, vacant land, or land being considered as though vacant." *Chambers Management Corp. v. Lane County Assessor*, TC-MD 060354D, 2007 WL 1068455 at *3 (Or Tax M Div. Apr 3, 2007) (citations omitted). "The court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, 2003 WL 21263620 at *3 (Or Tax M Div Mar 26, 2003).

Because Plaintiffs are seeking affirmative relief in this appeal, they have the burden of proof and must prove, by a preponderance of the evidence, that there is an error in the real market value appearing on the assessment and tax rolls. ORS 305.427; *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Id.* "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). Taxpayer cannot sustain their burden of proof merely through noting errors in Defendant's position but must instead "provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD

110300D, WL 879285 (Or Tax M Div Mar 13, 2012).

Jackson's appraisal is divided into two parts: first, is a standard sales comparison approach of the subject property using the hypothetical assumption that the dwelling is in good condition; second, an analysis with the hypothetical assumption that the dwelling suffers from such severe functional obsolescence that it has zero value.

A.      *Subject Property Value assuming a good condition*

Jackson considered the cost and income approaches but rejected them because of the age of the dwelling and the restrictions on its economic use. Those rejections appear appropriate in this case. For his sales comparison analysis Jackson considered six recent sales and adjusted the sales price for a number of factors. Defendant offered no significant opposition to this part of Plaintiffs' evidence. Further, under cross-examination, Stokes was unable to connect the comparable sales he selected and his ultimate opinion of value. The court finds Defendant's appraisal and testimony of Stokes to be unpersuasive in determining a value for the subject property. The court accepts Plaintiffs' value, with the hypothetical assumption that the property is in good condition, at $975,000 as of January 1, 2018.

B.      *Assumption of complete functional obsolescence*

Plaintiffs argue that the dwelling is in such poor condition that its value is zero. Jackson's report states: "the subject has significant dry rot damage to many of the structural beams within the building that became damages due to poor construction and faulty materials." (Ex 1 at 47.) Jackson's testimony and report conclude the house is "not financeable" because it could not pass a dry-rot inspection. *Id*. The report also recounts the decision of the neighbor to tear down their property that was built around the same time and by the same builder as the subject, rather than attempt to fix defects, as evidence of zero value.

Since Jackson is not a property inspector and did not review the property until after Plaintiffs replaced the exterior cladding, he relied on reports from others. Jackson did not personally talk to anyone who prepared the reports upon which he relied. Thus, the court is in as good a position as Jackson to review those reports to substantiate his conclusions.

C.    *Western Architectural reports*

Plaintiffs submitted two reports from Western Architectural. These reports are almost two decades old. Nevertheless, given Plaintiffs' uncontroverted testimony that the exterior of the house was not repaired until summer 2018, the evidence from these reports is persuasive that the exterior cladding was defective as of the assessment dates under consideration. Beyond the outer cladding, however, the reports only leave it to the imagination the conditions of the underlying structure of the dwelling. The court finds that these reports lack sufficient evidence on the extent of damage to the underlying structure.

D.    *JDR Builder proposal for house repairs*

Jackson's appraisal placed much weight on the repair proposal by JDR Builders in the amount $477,477, but, there is no evidence that JDR made any observations of the underlying structure in order to make the estimations contained in its proposal. Many of the proposed charges appear to include padded figures[3] or constitute upgrades. Emami testified that the stucco and underlying cladding were replaced with Hardie Plank material. No evidence was presented that anyone made observations of the underlying structure when the cladding was removed, nor any evidence of the costs incurred. Plaintiffs could have preserved the evidence of underlying structural damage when they removed the outer cladding from the dwelling, other than a few

---

[3] Page 1 of the proposal includes over $85,000 in charges for a "Super Indendant," (sic) "Project Manager," for tools, travel expense (presumably because the contractor is from Tualatin), or a field office (when the proposal calls for use of the property garage as the "office.") (Ex. 1 at 76, 79.)

superficial pictures, but simply failed to do so. Finally, Jackson testified that he increased the JDR proposal by 25 percent for contingencies and overruns, despite the proposal already containing a provision for contingencies. That testimony lacked any foundation.

E.    *Other arguments*

Plaintiffs' other arguments are also unpersuasive. The testimony about the neighbor's decision to tear down and rebuild the "sister" property was third-level hearsay[4] and speculative. The somewhat recent purchases of the subject property and the "sister" properties, for $515,000 and $775,000 respectively, when the parties were aware of the conditions of the dwellings, undercuts the zero value for the dwellings in Jackson's appraisal report.

### III.  CONCLUSION

Ultimately, the court offers this paraphrased interpretation of Plaintiffs' evidence – if anyone had looked at the structure underlying the cladding, they would have observed tremendous water damage to the dwelling leading to the conclusion that it was worthless – but no individual or report ever offered evidence that they looked. Thus, the testimony from Massaad the structural engineer, and Strauss the architect, were not persuasive. The court is persuaded that as of the assessment dates the dwelling had some functional obsolescence, in the form of defective stucco and water intrusion. Plaintiffs did not present sufficient evidence as to the extent of that damage or cost to cure.

The court rejects Plaintiffs' evidence of complete functional obsolesce. What remains is a real market value of $975,000 as of January 1, 2018, and some unknown and unproved amount of functional obsolesce. The court is unable to make a determination of the real market value as

---

[4] The best the court can determine, a builder told the owners of the property who told their relator, who told Jackson.

of the assessment dates based on the evidence presented.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ___ day of May 2020.

_____
RICHARD DAVIS
MAGISTRATE


*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on May 11, 2020.*